DAN RAYFIELD  #064790
Attorney General
PAUL L. SMITH  #001870
Solicitor General
ROBERT A. KOCH  #072004
Attorney-in-Charge
Civil & Administrative Appeals
1162 Court St.
Salem, Oregon 97301
Telephone:  (503) 378-4402

Counsel for Defendant-Appellant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| SARAH MILES, as Personal Representative of the Estate of Derrick Dewayne Clark, Jr.; and on behalf of minor child R.L.C.; minor sibling D.M.M.; and mother SARAH MILES in her individual capacity, <br><br> Plaintiffs-Appellees, <br><br> v. <br><br> ZACHARY COLE, <br><br> Defendant-Appellant, <br><br> and <br><br> CLACKAMAS COUNTY, a municipal corporation; DANIEL FERGUSON, NICHOLAS ADLER, JASON BENTO, MATTHEW BROWN, SHAWN CHOE, AARON CLARK, JORDAN FERGUSON, SIERRA HANCOCK, DAVID HEIMBUCK, NATHAN HULSEY, ANDY KIESEL, KYLE MALIZIA, DONALD MCCAFFERTY, BETH MAYER, JERED REYNOLDS, RYAN ROGERS, PETER ROBINSON, HAYDEN SANDERS, SAMUEL TOOZE, ADAM TAYLOR, MICHAEL ZACHER, GRANT ZAITZ; ZACHARY COLE; ALEXANDER MAWSON, and OFFICER DOES I-X, <br><br> Defendants Below. | Case No.  3:23-cv-01805-SB <br><br> NOTICE OF APPEAL |

Page 1 -  NOTICE OF APPEAL
    RAK/kw5/1018794617

Notice is given that defendant-appellant, Zachary Cole, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the opinion and order entered on March 31, 2026, Docket No. 234, by the Honorable Stacie F. Beckerman of the United States District Court for the District of Oregon.  The Ninth Circuit Court of Appeals has jurisdiction over this matter pursuant to the collateral order doctrine, because the district court denied appellant's defense based on qualified immunity.

<div style="margin-left:45%">

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
PAUL L. SMITH  #001870
Solicitor General

/s/  Robert A. Koch
_____
ROBERT A. KOCH  #072004
Attorney-in-Charge
Civil & Administrative Appeals
robert.a.koch@doj.oregon.gov

Attorneys for Defendant-Appellant
Zachary Cole

</div>

Page 2 -   NOTICE OF APPEAL
　　　RAK/kw5/1018794617

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SARAH MILES, as Personal Representative
of the Estate of Derrick Dewayne Clark, Jr.;
and on behalf of minor child R.L.C.; minor
sibling D.M.M.; and mother SARAH MILES
in her individual capacity,

Plaintiffs,

v.

CLACKAMAS COUNTY, a municipal
corporation; DANIEL FERGUSON,
NICHOLAS ADLER, JASON BENTO,
MATTHEW BROWN, SHAWN CHOE,
AARON CLARK, JORDAN FERGUSON,
SIERRA HANCOCK, DAVID HEIMBUCK,
NATHAN HULSEY, ANDY KIESEL,
KYLE MALIZIA, DONALD
MCCAFFERTY, BETH MAYER, JERED
REYNOLDS, RYAN ROGERS, PETER
ROBINSON, HAYDEN SANDERS,
SAMUEL TOOZE, ADAM TAYLOR,
MICHAEL ZACHER, GRANT ZAITZ;
ZACHARY COLE; ALEXANDER
MAWSON, and OFFICER DOES I-X,[1]

Defendants.

Case No. 3:23-cv-01805-SB

**OPINION AND ORDER**

---

[1] The Court dismisses the unidentified Doe defendants.

PAGE 1 – OPINION AND ORDER

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Sarah Miles ("Miles"), appearing as personal representative of the Estate of Derrick Dewayne Clark, Jr. ("Clark"), on behalf of Clark's minor child R.L.C. and minor sibling D.M.M., and in her individual capacity as Clark's mother (together, "Plaintiffs"), alleges constitutional claims under 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1985 ("Section 1985"), and state law claims against Defendants Clackamas County and individual law enforcement officers Nicholas Adler ("Officer Adler"), Jason Bento ("Officer Bento"), Matthew Brown ("Officer Brown"), Shawn Choe ("Officer Choe"), Aaron Clark ("Officer Clark"), Daniel Ferguson ("Deputy Ferguson"), Jordan Ferguson ("Officer Ferguson"), Sierra Hancock ("Officer Hancock"), David Heimbuck ("Sergeant Heimbuck"), Nathan Hulsey ("Officer Hulsey"), Andy Kiesel ("Officer Kiesel"), Kyle Malizia ("Officer Malizia"), Donald McCafferty ("Officer McCafferty"), Beth Mayer ("Officer Mayer"), Jered Reynolds ("Officer Reynolds"), Ryan Rogers ("Officer Rogers"), Peter Robinson ("Officer Robinson"), Hayden Sanders ("Deputy Sanders"), Samuel Tooze ("Officer Tooze"), Adam Taylor ("Officer Taylor"), Michael Zacher ("Officer Zacher"), Grant Zaitz ("Officer Zaitz") (together, the "County Defendants" ), Oregon State Police ("OSP") Trooper Zachary Cole ("Trooper Cole"), and Oregon City Police Officer Alexander Mawson ("Officer Mawson") (together, "Defendants"), relating to Clark's death resulting from deadly force on June 18, 2022. (*See generally* Third Am. Compl. ("TAC"), ECF No. 114.)

Now before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 121-23, 159, 186, 189.) The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1367. For the following reasons, the Court grants in part and denies in part Plaintiffs' motions for summary judgment (ECF Nos. 121-23), grants in part and denies in part

PAGE 2 – OPINION AND ORDER

the County Defendants' motion for summary judgment (ECF No. 159), denies Officer Mawson's motion for summary judgment (ECF No. 186), and grants in part and denies in part Trooper Cole's motion for summary judgment (ECF No. 189).

## BACKGROUND

On June 18, 2022, Clark left the Heritage Pub in Portland, Oregon, shortly before 1:00 a.m. (Decl. Jeronimo Rodriguez ("Rodriguez Decl.") at 9, ECF No. 208; *see also* Decl. Rebecca Millius ("Dr. Millius Decl.") Ex. 2 at 5, ECF No. 190; Dep. Trooper Zachary Cole ("Trooper Cole Dep.") at 43:13, Mar. 26, 2025, ECF Nos. 124, 191, 205; Dep. Deputy Daniel Ferguson ("Deputy Ferguson Dep.") at 75:22-25, Nov. 28, 2022, ECF Nos. 124, 205; Deputy Daniel Ferguson Interview ("Deputy Ferguson Interview") at 3:23-24, ECF Nos. 124, 205; Decl. Adam Bercovici ("Bercovici Decl.") at 7, ECF No. 207.) At the same time, Clackamas County Sheriff's Office ("CCSO") Deputy Ferguson was working patrol on SE 82nd Avenue, looking to make stops for driving under the influence ("DUI"). (Decl. Daniel Ferguson Supp. Cnty. Defs.' Mot. J. ("Deputy Ferguson Decl.") ¶ 9, ECF No. 165; Deputy Ferguson Interview at 3:8-12; Deputy Daniel Ferguson Grand Jury Tr. ("Deputy Ferguson Tr.") at 3:21-14, ECF No. 205; Det. Brent Wadsworth Grand Jury Tr. ("Det. Wadsworth Tr."), at 9:7-10, Nov. 28, 2022, ECF Nos. 124, 205; Rodriguez Decl. at 9; Bercovici Decl. at 7.) Deputy Ferguson observed "a maroon Pontiac exit the Heritage Pub and fail to maintain its lane[.]" (Deputy Ferguson Decl. ¶ 3; *see also* Dr. Millius Decl. Ex. 2 at 5; Trooper Cole Dep. at 48:1-2; Det. Wadsworth Tr. at 9:11-21; Deputy Ferguson Interview at 3:24-25, 4:15-16; Deputy Ferguson Tr. at 3:17-25, Trooper Cole Dep. at 47:13-16.) Deputy Ferguson believed that the driver may be under the influence. (Trooper Cole Dep. at 40:18-20, 50:8-12; Deputy Ferguson Decl. ¶ 4; Deputy Ferguson Interview at 4:11.)

A second law enforcement official, OSP Trooper Cole, also observed the maroon Pontiac. (Deputy Ferguson Decl. ¶ 5; Dr. Millius Decl. Ex. 2 at 5; Trooper Cole Dep. at 28:13-

PAGE 3 – OPINION AND ORDER

19, 40:2-3, Det. Wadsworth Tr. at 10:4-25, 11:10-11; Bercovici Decl. at 7.) Trooper Cole began to tail Clark because someone leaving a bar at 1:00 a.m. and approaching a highway is of interest for DUI enforcement. (Cole Dep. at 48:4-10, 51:1-7, 52:13-53:7.) Trooper Cole observed Clark go over the fog line by more than a tire width and that his lights were off. (Trooper Cole Dep. at 61:25-63:24.) Trooper Cole also observed that Clark's vehicle had no license plate and no temporary registration on the back window. (Det. Wadsworth Tr. at 8:14-16; Deputy Ferguson Interview at 4:5-6; Trooper Cole Dep. at 69:2-4.) Trooper Cole could not see the driver and without a license plate, he was unable to identify the driver. (Trooper Cole Grand Jury Tr. ("Trooper Cole Tr.") at 16, ECF No. 124.)

Trooper Cole activated his overhead lights to initiate a traffic stop. (Hamoudi Decl. Ex. F ("Trooper Cole Body-Worn Video") at 12:51:54-12:52:19 a.m., ECF No. 124.) The vehicle sped away and Trooper Cole initially chose not to pursue because OSP policy does not permit initiating a pursuit on suspicion of a DUI. (Deputy Ferguson Decl. ¶ 5; Dr. Millius Decl. Ex. 2 at 5; Trooper Cole Dep. at 53:1-12, 69:8-12; Det. Wadsworth Tr. at 11:12-15; Rodriguez Decl. at 10; Bercovici Decl. at 7-8.)

Deputy Ferguson activated his lights and continued tailing the vehicle and the "pursuit continued onto a rural two-lane road, with speeds exceeding [eighty] mph." (Rodriguez Decl. at 10; *see also* Bercovici Decl. at 8; Dr. Millius Decl. Ex. 2 at 5; Det. Wadsworth Tr. at 15:1-17; Hamoudi Decl. Ex. G ("Deputy Ferguson In-Car Video") at 12:54:27 a.m., ECF No. 124.) Trooper Cole re-joined the pursuit and re-activated his traffic lights. (Trooper Cole Dep. at 40:12-16, 54:1-3; Det. Wadsworth Tr. at 10:4-5; Dr. Millius Decl. Ex. 2 at 5; Deputy Ferguson In-Car Video at 12:51:54-12:52:19 a.m.) Trooper Cole re-initiated his pursuit because OSP policy allows a trooper to assist a law enforcement officer from another agency who is in lone

PAGE 4 – OPINION AND ORDER

pursuit. (Trooper Cole Dep. at 40:8-16, 53:22-20:3, Det. Wadsworth Tr. at 12:3-11; Trooper Cole Body-Worn Video at 12:52:52-12:53:20 a.m.)

When Clark sped up, Trooper Cole terminated his pursuit pursuant to OSP policy. (Trooper Cole Dep. at 40:4-6, 53:8-12, Det. Wadsworth Tr. at 11:12-19, Trooper Cole Body-Worn Video at 12:52:31-12:52:52 a.m.) Deputy Ferguson continued to pursue Clark. (Trooper Cole Body-Worn Video at 12:52:52-12:53:08 a.m.) Shortly thereafter, Sergeant Heimbuck instructed Deputy Ferguson to terminate the pursuit. (Bercovici Decl. at 8; Deputy Ferguson In-Car Video at 12:54:08-12:54:15 a.m.) Deputy Ferguson slowed and deactivated his lights. (Deputy Ferguson In-Car Video at 12:54:15-12:54:20 a.m.) At almost the same time, Clark's vehicle "either crashed into the north side ditch or ended up in the ditch when [Clark] attempted to park the vehicle." (Dr. Millius Decl. Ex. 2 at 5; *see also* Deputy Ferguson Decl. ¶ 8; Det. Wadsworth Tr. at 13:16-18; Rodriguez Decl. at 10; Bercovici Decl. at 8; Trooper Cole Body-Worn Video at 12:54:19-12:54:35 a.m.)

Clark tried to reverse out of the ditch. (Deputy Ferguson In-Car Video at 12:54:27-12:54:31 a.m.) Deputy Ferguson conducted "pin maneuvers to keep Mr. Clark's vehicle in the ditch" and Trooper Cole "stopped in the roadway next to" Deputy Ferguson's vehicle. (Deputy Ferguson Decl. ¶ 8; Millius Decl. Ex. 2 at 5; *see also* Rodriguez Decl. at 10; Bercovici Decl. at 8; Trooper Cole Body-Worn Video at 12:54:27-12:54:37 a.m.) In conducting the pin maneuvers, Deputy Ferguson twice struck the rear of Clark's vehicle with his patrol car. (Rodriguez Decl. at 10; Bercovici Decl. at 8; Trooper Cole Body-Worn Video at 12:54:19-12:54:36 a.m.) Trooper Cole moved his vehicle so that it formed a V-formation with Deputy Ferguson's vehicle. (Trooper Cole Body-Worn Video at 12:54:27-12:54:37 a.m.) Clark continued to try to elude after the pin maneuvers. (Deputy Ferguson Decl. ¶ 8.) Deputy Ferguson stated that he knew that there

PAGE 5 – OPINION AND ORDER

was a residential neighborhood near where this stop took place. (*Id.*) Trooper Cole describes this event as a high-risk traffic stop because Clark had attempted to elude police. (Trooper Cole Tr. at 21.)

Deputy Ferguson and Trooper Cole then exited their vehicles and approached Clark with their firearms drawn. (Det. Wadsworth Tr. at 13:18-20; Rodriguez Decl. at 10; Bercovici Decl. at 8; Trooper Cole Body-Worn Video at 12:54:36-12:54:41 a.m.) Both officers ordered Clark to exit his vehicle with his hands raised. (Bercovici Decl. at 8; Det. Wadsworth Tr. at 16:17-18, 23:6-7; Rodriguez Decl. at 10.) While Clark was still in his vehicle with the door closed, Trooper Cole could not see Clark. (Trooper Cole Tr. at 22; Trooper Cole Body-Worn Video at 12:54:36-12:54:51 a.m.)

Clark then exited his vehicle. (Deputy Ferguson Decl. ¶ 11; Bercovici Decl. at 8; Trooper Cole Dep. at 40:1-2; Hamoudi Decl. Ex. E ("Trooper Cole In-Car Video") 12:54:41-12:54:44 a.m.; Trooper Cole Body-Worn Video at 12:54:41-12:54:44 a.m.) Trooper Cole saw a gun in Clark's hand. (Trooper Cole Dep. at 37:23-25, Det. Wadsworth Tr. at 19:15-25.) Trooper Cole saw the barrel of the gun for "a split second." (*Id.*; *see also* Trooper Cole Tr. at 25.) Clark ran away. (Rodriguez Decl. at 10; Deputy Ferguson Decl. ¶ 11; Trooper Cole Dep. at 12:14-17, 13:19-23, 56:2-4, Det. Wadsworth Tr. at 15:19-23, 17:4-7.) As Clark fled, he held the gun in his right hand. (Deputy Ferguson Decl. ¶ 11; Trooper Cole Dep. at 11:20-22, 14:17-20; Rodriguez Decl. at 10; Bercovici Decl. at 8.) Deputy Ferguson saw an object in Clark's hand that he believed may have been a gun. (Deputy Ferguson Decl. ¶ 11.)

On his way toward the road, Clark ran directly in front of Trooper Cole's car. (Trooper Cole Dep. at 14:24-25, 15:5-6, 37:5-6, 16, 43:4, 11-12, Det. Wadsworth Tr. at 20:12-14, 23:4-7; Trooper Cole Body-Worn Video at 12:54:41-12:54:45 a.m.) Trooper Cole believed that Clark

PAGE 6 – OPINION AND ORDER

was coming around the front of Trooper Cole's vehicle to engage in a gunfight. (Trooper Cole Dep. 14:21-25.) Trooper Cole believed he was about to get shot. (Trooper Cole Tr. at 23.) Trooper Cole briefly retreated to the back of his vehicle and lost sight of Clark. (Trooper Cole Tr. at 25-26; Trooper Cole Dep. at 14:13-20.)

After Trooper Cole saw the barrel of Clark's gun and then briefly took cover, Trooper Cole shot at Clark and yelled "gun, gun, gun, gun[.]" (Deputy Ferguson Decl. ¶ 12; Trooper Cole Dep. at 42:1-3, Det. Wadsworth Tr. at 21:10-12, 20-22, 22:7-8; Rodriguez Decl. at 10; Bercovici Decl. at 8; Trooper Cole Body-Worn Video at 12:54:45-12:54:50 a.m.) Trooper Cole did not have time to announce his intention to shoot or engage in de-escalation efforts. (Trooper Cole Tr. at 27-28; Trooper Cole Dep. at 76:6-10.)

Deputy Ferguson heard the single gunshot which he believed confirmed that Clark was holding a gun. (Deputy Ferguson Decl. at 106.) Deputy Ferguson then fired his first shot at Clark. (Deputy Ferguson Decl. ¶ 15; Rodriguez Decl. at 10; Bercovici Decl. at 8.) Trooper Cole saw Clark's gun come out and away from Clark's body as he continued to run away. (Trooper Cole Tr. at 30; Trooper Cole Dep. at 56:10-21.) In response, about five seconds after Deputy Ferguson fired his first shot, Trooper Cole once again yelled "gun, gun, gun, gun!" (Trooper Cole Body-Worn Video at 12:54:42-12:54:47 a.m.)

Clark continued to flee down a three-foot embankment. (Ferguson Decl. ¶¶ 14-15.) Officers later found his gun near a chain-link fence. (Trooper Cole Dep. at 58:25-59:3-5; Det. Wadsworth Tr. at 3:7-9; Rodriguez Decl. at 10-11; Bercovici Decl. at 8.) Trooper Cole worried that Clark had a good vantage point to shoot at the officers and Trooper Cole moved toward the embankment to prevent Clark from having a good position of cover. (Trooper Cole Tr. at 29.) In total, Deputy Ferguson fired five shots at Clark, and Trooper Cole fired three shots. (Deputy

PAGE 7 – OPINION AND ORDER

Ferguson Body-Worn Video at 12:54:22-12:54:55 a.m.; Deputy Ferguson Dep. at 117:4; Trooper Cole Body-Worn Video at 12:54:30-12:54:55 a.m.) Trooper Cole alleges that he stopped firing when he no longer believed that Clark posed an immediate threat to him and Deputy Ferguson. (Trooper Cole Dep. at 33:21-23; Trooper Cole Tr. at 30-31.)

Deputy Ferguson and Trooper Cole lost sight of Clark but then attempted to find Clark. (Trooper Cole Dep. at 41:18-21, Det. Wadsworth Tr. at 31:18-19; Deputy Ferguson Decl. ¶ 19.) Trooper Cole told Deputy Ferguson that he believed Clark was lying down near the fence, but later stated that he was not sure if he had continued running, was lying down, or was waiting to ambush the officers. (Bercovici Decl. at 9; Trooper Cole Dep. at 96:14-17, Det. Wadsworth Tr. at 26:13-18.) Trooper Cole states that he never saw Clark discard the gun. (Trooper Cole Tr. at 31-32.) Trooper Cole once again yelled out for Clark to put his hands up. (Trooper Cole Body-Worn Video at 12:55:57-15:56:04 a.m.)

Trooper Cole then radioed for medical assistance and requested that the medical team set up at the intersection of SE Harmony Avenue and Railroad Road. (Bercovici Decl. at 9; Trooper Cole Dep. at 85:21-23, 90:7-8, Det. Wadsworth Tr. at 27:1-2; Rodriguez Decl. at 11:4-5; Trooper Cole Body-Worn Video at 12:56:08-12:56:15 a.m.) Neither he nor Deputy Ferguson attempted to render medical aid to Clark. (*Id.*) Trooper Cole maintains that he did not render medical aid because he was not sure whether Clark was still armed or whether he had been injured and he did not know Clark's precise location. (Trooper Cole Tr. at 33.) At this point, Trooper Cole thought that Clark may still be alive. (Trooper Cole Dep. at 80:12-14.) Trooper Cole told dispatch that Clark was likely lying down near the fence, although he was not sure. (Trooper Cole Dep. at 98:14-17.)

///

PAGE 8 – OPINION AND ORDER

When additional officers arrived on the scene, Deputy Ferguson reported that he had observed Clark fail to maintain his lane. (Trooper Cole Body-Worn Video at 01:01:54-01:02:03 a.m.) Sergeant Heimbuck asked whether Clark had fired any shots and Deputy Ferguson responded, "I don't think he did." (Bercovici Decl. at 9; Rodriguez Decl. at 11.) Sergeant Heimbuck also asked Deputy Ferguson whether Clark had shot at him and "Deputy Ferguson answered, '[y]es, it is possible.'" (Bercovici Decl. at 9; Rodriguez Decl. at 12.) From this conversation, Deputy Ferguson learned that Clark had not shot at Trooper Cole. (Deputy Ferguson Decl. ¶ 19.) Shortly thereafter, Deputy Ferguson told Officer Jordan Ferguson that he did not recall Clark shooting his gun. (Rodriguez Decl. at 12; Bercovici Decl. at 9.) Trooper Cole told Officer Jordan Ferguson that Clark had a gun "in his right hand as he was running and he pointed it at me[,]" but Trooper Cole never said that Clark turned around and faced him. (Trooper Cole Body-Worn Video at 01:01:21-01:01:38 a.m.) Deputy Ferguson asked Trooper Cole if he thought Clark fired his weapon and Trooper Cole responded that he did not "think so." (*Id.* at 01:05:15-01:05:19 am.)

At some point after 1:00 a.m., Trooper Cole was relieved from his position on the perimeter and subsequently turned off his body camera. (Trooper Cole Dep. at 79:11-80:8; Trooper Cole Body-Worn Video at 1:05:20-1:32:40 a.m.) At this point, Trooper Cole thought Clark may still be alive. (Trooper Cole Dep. at 85:4-12.)

At 1:01 a.m., Clackamas Fire and Medical arrived at the scene. (*Id.*) At around 1:00 a.m., the remaining individual County Defendants (with the exception of the Special Weapons and Tactics ("SWAT") response team) arrived at the scene but did not render aid to Clark. (*See* Decl. Officer Aaron Clark ("Officer Clark Decl.") ¶ 3, ECF No. 161; Decl. Officer Aaron Taylor ("Officer Taylor Decl.") ¶ 3, ECF No. 163; Decl. Officer David Heimbuck ("Officer Heimbuck

PAGE 9 – OPINION AND ORDER

Decl.") ¶ 3, ECF No. 166; Decl. Deputy Hayden Sanders ("Deputy Sanders Decl.") ¶ 3, ECF No. 169; Decl. Officer Jered Reynolds ("Officer Reynolds Decl.") ¶ 3, ECF No. 172; Decl. Officer Jordan Ferguson ("Officer Ferguson Decl.") ¶ 3, ECF No. 171; Decl. Officer Shawn Choe ("Officer Choe Decl.") ¶ 3, ECF No. 181; Decl. Officer Ryan Rogers ("Officer Rogers Decl.") ¶ 3, ECF No. 180; Decl. Officer Sierra Hancock ("Officer Hancock Decl.") ¶ 3, ECF No. 182.)

At around 1:10 a.m., officers launched a drone that "showed a very clear thermal signature that appeared to be of a human being, which they recognized as Mr. Clark." (Rodriguez Decl. at 12; *see also* Deputy Grant Zaitz Grand Jury Tr. ("Deputy Zaitz Tr.") at 7:25-8:2, Nov. 28, 2022, ECF No. 124; Hamoudi Decl. Ex. N ("Officer Clark Body-Worn Video") at 1:34:15-1:34:30 a.m., ECF No. 124.) The thermal signature did not move. (Det. Ferguson Tr. at 85:25-86:2; Dep. Deputy Hayden Sanders ("Deputy Sanders Dep.") at 60:10-16, Apr. 8, 2025, ECF No. 124; Rodriguez Decl. at 12.) Officers observed what appeared to be a pool of sanguine liquid surrounding the thermal signature that "was likely blood." (Rodriguez Decl. at 12; *see also* Clark Decl. ¶ 6; Tooze Decl. ¶ 6.) Officers observed that the pool was getting lighter because the blood was cooling outside of the body. (Officer Aaron Clark Body-Worn Video at 1:34:15-1:34:30 a.m.) The officers could not confirm the presence of this liquid with the drone. (*Id.*; Clark Decl. ¶ 6; Tooze Decl. ¶ 6.) Shortly thereafter, Officer Lang heard someone yelling "shut up" or "help" and moaning from the opposite direction where the officers believed Clark was located. (Lang Decl. ¶ 8.)

At around 2:15 a.m., the SWAT officers, including Officer Adler, Officer Castro, Officer Hulsey, Officer McCafferty, Officer Reynolds, Deputy Robinson, Deputy Sanders, Officer Mawson, Officer Zacher, and Deputy Zaitz (together, the "SWAT Defendants") gathered in a nearby commercial parking lot in a Mine Resistance Ambush Vehicle. (Rodriguez Decl. at

PAGE 10 – OPINION AND ORDER

12:19-21; Sanders Decl. ¶¶ 3-4; Decl. Officer Peter Robinson ("Officer Robinson Decl.") ¶¶ 10-11, ECF No. 178; Decl. Officer Alexander Mawson ("Officer Mawson Decl.") at 3, ECF No. 187; Decl. Officer Grant Zaitz ("Officer Zaitz Decl.") ¶ 8, ECF No. 168; Deputy Sanders Dep. at 58:10-25.)

At approximately 2:23 a.m., the SWAT Defendants located the gun that Clark had thrown over the fence. (Rodriguez Decl. at 12:20-21; Deputy Sanders Tr. at 51:15-25; Officer Robinson Decl. ¶ 8; Decl. Officer Ryan Castro ("Officer Castro Decl.") ¶ 8, ECF No. 179.) Officer Mawson laughed and said, "[s]o that means he doesn't have it." (Hamoudi Decl. Ex. O ("Officer Mawson Body-Worn Video") at 2:23:00-2:23:10 a.m., ECF No. 124.) Officer Mawson, an Oregon City police officer, was part of the Clackamas County Negotiation Team. (Officer Mawson Dep. at 18:14-23.) The gun was a nine-millimeter handgun that was operational and loaded, with one round in the chamber and eleven rounds in the magazine. (Trooper Cole Tr. at 5-9.) A few minutes later, Officer Mawson said, "[w]ell it's cool there's a gun." (Officer Mawson Body-Worn Video at 2:25:45-2:25:55 a.m.)

Officer Mawson then drove the armored vehicle up to the fence where Clark was lying and where the gun had been located. (Rodriguez Decl. at 13; Officer Mawson Body-Worn Video at 2:26:00-2:26:10 a.m., Officer Alexander Mawson Dep. ("Officer Mawson Dep.") at 60:10-14, April 9, 2025, ECF No. 124; Officer Mawson Decl. at 3; Officer Robinson Decl. ¶ 11; Officer Zaitz Decl. ¶ 11.) Clark was lying on the ground about six feet from the armored vehicle. (Officer Mawson Body-Worn Video at 2:26:00-2:26:10 a.m.; Rodriguez Decl. at 13.) The officers began to loud-hail Clark, warning him to reveal himself or they would use force. (Zaitz Decl. ¶ 12; Officer Mawson Body-Worn Video at 2:26:00-2:52:30 a.m.) The SWAT Defendants "laughed and joked" that they would eventually have probable cause. (Deputy Ferguson Dep. at

PAGE 11 – OPINION AND ORDER

128:1-10.) Officer Reynolds ordered Clark to reveal himself with his hands up and warned him that force would be used if he did not cooperate. (Deputy Zaitz Tr. at 86:24-87:1; Rodriguez Decl. at 13; Officer Reynolds Decl. ¶¶ 6-7.) Officer Reynolds specifically warned that "a police canine may be used" and requested that Clark wave his arms if he could hear the officers. (Officer Reynolds Decl. ¶¶ 6-7.) Deputy Sanders said "I think you just drop a bang on him" and "I say we just toss a bang right in his lap." (Sanders Decl. ¶ 21.) An unidentified officer said "[a] bang and a stinger ball would be fuckin' sick." (Hamoudi Decl. Ex. P ("Casey Newton Body-Worn Video") at 2:26:00-2:26:20 a.m., ECF No. 124; Hamoudi Decl. Ex. L ("Nate Ariel Body-Worn Video") at 2:27:50-2:28:05 a.m., ECF No. 124.)

The officers then "started increasing the level of force." (Deputy Zaitz Tr. at 87:14-15, Officer Mawson Dep. at 11:7-15.) At approximately 2:31 a.m., Deputy Sanders threw a flash bang device within five or six feet of Clark. (Deputy Sanders Decl. ¶ 7; Rodriguez Decl. at 13; Deputy Zaitz Tr. at 87:12-13, Ex. O at 2:28:20 a.m.-2:28:30 a.m.) Officer Robinson authorized use of the flash bang. (*Id.*; Rodriguez Decl. at 13:8-9.) Clark did not respond after the flash bang exploded and the drone reported no movement. (Deputy Zaitz Tr. at 87:13-14, Officer Mawson Body-Worn Video at 2:31:20-2:31:30 a.m.; Rodriguez Decl. at 13.) Other SWAT team members verbalized the same. (Rodriguez Decl. at 13; Hamoudi Decl. Ex. R ("Dep. Kishpaugh Body-Worn Video") at 2:34:08-2:34:50 a.m.)

At 2:34 a.m., Deputy Sanders deployed a stinger ball by hand but the device hit the fence and bounced back into the parking lot where the SWAT team was located. (Deputy Sanders Decl. ¶ 8.) At 2:38 a.m., Deputy Sanders deployed a second stinger ball which landed close to where Deputy Sanders believed Clark was located. (*Id.* ¶ 9.) A stinger ball is capable of causing burns but is not "intended" to cause injury. (*Id.* ¶ 10.) Deputy Sanders threw these devices with

PAGE 12 – OPINION AND ORDER

"the intention [of] irritating or disorienting" Clark. (*Id.* ¶ 13.) Deputy Sanders did not warn Clark prior to deploying these devices. (*Id.* ¶ 19.) Deputy Sanders did not know whether Clark was armed at this time. (*Id.* ¶ 18.) No one rendered medical aid to Clark. (*See generally* Deputy Sanders Decl.)

The officers discussed available options. (Rodriguez Decl. at 14; Dep. Kishpaugh Body-Worn Video at 2:44:50-2:46:05 a.m.) Deputy Dennis Kishpaugh said, "[l]et's just bite him already" and if Clark emerged, the officers would "forty him." (*Id.*) Officer Mawson referred to Clark as "a warm, dead deer" and an "ole boy[.]" (Officer Mawson Body-Worn Video at 2:35:50-2:44:00 a.m.; Rodriguez Decl. at 14:5-7; Officer Mawson Decl. at 3.) Officer Mawson also said, "[w]e're just going to do some janky shit." (Officer Mawson Body-Worn Video at 2:44:40-2:44:45 a.m.; Rodriguez Decl. at 14.) Officer Reynolds "laughed at Officer Mawson's jokes" and said "I say we just give him the rotary." (Deputy Sanders Dep. at 98:22-25; Officer Mawson Body-Worn Video at 2:49:15-2:49:20 a.m.; Rodriguez Decl. at 14.)

At approximately 2:52 a.m., the officers decided to deploy a police K-9 on Clark. (Decl. Officer Donald McCafferty Supp. Cnty. Defs.' Mot. Summ. J. ("Officer McCafferty Decl.") ¶ 4, ECF No. 167; Officer Donald McCafferty Dep. ("Officer McCafferty Dep.") at 66:18-21, Apr. 8, 2025, ECF No. 124.) Officer McCafferty believed that "the canine was a good option because the dog's senses and training made it well-suited to locate and safely approach [] Clark in the bushes." (Officer McCafferty Decl. ¶ 12; *see also* Officer McCafferty Dep. at 64:18-23.) The SWAT team "purposefully chose not to give specific K-9 warnings" to Clark before directing the K-9 to bite. (Rodriguez Decl. at 14:15-16; *see also* Officer McCafferty Dep. at 72:9-13.) The canine found Clark and bit him one time. (Deputy Zaitz Tr. at 86:3-4; Rodriguez Decl. at 14; *see also* Officer McCafferty Decl. ¶ 5, "I gave the 'bite' command so that the dog would hold its

PAGE 13 – OPINION AND ORDER

bite.") When there was no response from Clark, the officers eventually recalled the dog. (Deputy Zaitz Tr. at 10:4-6.)

At approximately 2:53 a.m., Clark was pronounced dead at the scene. (Rodriguez Decl. at 14; Millius Decl. Ex. 2.) Clark sustained gunshot wounds to the atrium, the upper part of the heart, and the back of the left ventricle. (Dr. Rebecca Millius Clark Autopsy Report ("Autopsy Report") at 1, June 19, 2022, ECF No. 124; *see also* Decl. Dr. Matthias Okoye ("Dr. Okoye Decl."), ECF No. 124.) The causes of Clark's death included "loss of function from the destruction of critical parts of the conduction system controlling the heart rate and regulating coordinated contractions of the upper and lower chambers of the heart, loss of blood from the perforating lacerations through the heart and the inferior vena cava (blood vessel carrying blood returning from the body into the heart), and loss of heart muscle tissue. (Dr. Millius Decl. ¶ 5; Dr. Okoye Decl. at 5-6.) There was bruising surrounding Clark's bullet wound (Dr. Okoye Decl. at 6) and lacerations on his skin. (Dr. Millius Decl. Ex. 1.) Clark lost approximately 25% of his blood volume between being shot and his autopsy. (Dr. Okoye Decl. at 6.)

## LEGAL STANDARDS

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting FED. R. CIV. P. 56(a)). "[T]he mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

"A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law." *Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022)

PAGE 14 – OPINION AND ORDER

(citing *Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 533 (9th Cir. 1996)); *see also Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("A fact is 'material' only if it might affect the outcome of the case[.]" (quoting *Anderson*, 477 U.S. at 248)). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (en banc) (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020)); *see also Fresno Motors, LLC*, 771 F.3d at 1125 ("[A] dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." (quoting *Anderson*, 477 U.S. at 248)).

In determining whether a genuine issue of material fact exists, a court views the evidence in the light most favorable to, and draws all justifiable inferences in favor of, the nonmoving party. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine 'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown*, 82 F.4th at 874 ("When determining whether a genuine issue of material fact exists, [a court] 'must draw all justifiable inferences in favor of the nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, a "court . . . may not judge credibility, weigh the evidence, or resolve factual disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of

PAGE 15 – OPINION AND ORDER

them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

## DISCUSSION

Plaintiffs assert several claims resulting from Clark's death on June 18, 2022:

(1)    excessive force claims against Deputy Ferguson and Trooper Cole for using deadly force (TAC ¶¶ 173-74);

(2)    excessive force claims against the defendant(s) who threw explosives at Clark (i.e., Deputy Sanders) (*id.*);[2]

(3)    failure to render medical care claims against all individual defendants (*id.* ¶¶ 175-76);

(4)    familial due process claims for violating the rights of Clark's mother (Miles) and minor child (R.L.C.)[3] against all individual defendants (*id.* ¶¶ 177-78);

(5)    intentional discrimination claims against the SWAT Defendants (*id.* ¶¶ 179-81);

(6)    conspiracy claims against the SWAT Defendants (a Section 1985(3) conspiracy based on racial animus and a Section 1983 conspiracy based on excessive force) (*id.* ¶¶ 182-88); and

(6)    assault/battery and negligence claims against Clackamas County (*id.* ¶¶ 163-72).

Plaintiffs filed three motions for summary judgment: one against the County Defendants (Pls.' Mot. Summ. J. Cnty. Defs. ("Pls.' Mot. Cnty. Defs."), ECF No. 121), one against Trooper Cole (Pls.' Mot. Summ. J. Trooper Cole ("Pls.' Mot. Trooper Cole"), ECF No. 122), and one against Officer Mawson (Pls.' Mot. Summ. J. Officer Mawson ("Pls.' Mot. Officer Mawson"),

---

[2] At oral argument, Plaintiffs provided notice that they are abandoning their excessive force claim related to the dog bite.

[3] At oral argument, Plaintiffs provided notice that they are abandoning their claims on behalf of Clark's sibling, D.M.M.

PAGE 16 – OPINION AND ORDER

ECF No. 123). The County Defendants, Trooper Cole, and Officer Mawson each filed cross-motions for summary judgment. (County Defs. Mot. Summ. J., ECF No. 159; Officer Mawson's Mot. Summ. J., ECF No. 186;[4] Officer Cole's Mot. Summ. J., ECF No. 189.)

## I.    EXPERT OPINION EVIDENCE

Defendants move to exclude Plaintiffs' expert declarations, i.e., the declarations of Dr. Matthias Okoye ("Dr. Okoye"), Adam Bercovici ("Bercovici"), and Jeronimo Rodriguez (Rodriguez"). (County Defs.' Reply Mot. Summ. J. ("Cnty. Defs.' Reply") at 7-15, ECF No. 216; Reply Supp. Def. Trooper Cole's Mot. Summ. J. ("Trooper Cole's Reply") at 7-9, ECF No. 217.)

### A.    Applicable Law

Federal Rule of Evidence 702 provides the standards for expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[4] In Mawson's motion for summary judgment, he incorporates in his motion all of the County Defendants' arguments in their motion for summary judgment. (*See* Officer Mawson's Mot. at 2.) Mawson's counsel was unable to appear for oral argument on the pending motions for summary judgment, but the Court has determined that oral argument was unnecessary.

FED. R. EVID. 702 (as amended Dec. 1, 2023). In other words, an expert must be qualified and expert testimony must be both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993).

First, expert testimony must be relevant. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (quoting 3 Weinstein & Berger ¶ 702, p. 702-18); *see also City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1044 (9th Cir. 2014) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (quoting *Primiano v. Cook,* 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))).

Second, the testimony must be reliable. The Ninth Circuit applies a flexible test:

> The test of reliability is flexible. The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. But these factors are meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case. The test is not the correctness of the expert's conclusions but the soundness of [the expert's] methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*City of Pomona,* 750 F.3d at 1044 (simplified). The Supreme Court has explained that, when considering non-scientific testimony, courts may consider whether the expert's "preparation is of a kind that others in the field would recognize as acceptable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151 (1999); *see also* FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). "It is the proponent

PAGE 18 – OPINION AND ORDER

of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Rule 702 was recently amended. "Effective December 1, 2023, Rule 702 clarified [that] the proponent of expert testimony must meet all of Rule 702's substantive standards for admissibility by a preponderance of evidence." *Cleaver v. Transnation Title & Escrow, Inc.*, No. 1:21-cv-00031-AKB, 2024 WL 326848, at *2 (D. Idaho Jan. 29, 2024); *see also* FED. R. EVID. 702 (explaining that the proponent of the evidence must demonstrate that it is more likely than not that the expert satisfies the admissibility requirements). The advisory committee cautions that courts had incorrectly "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." FED. R. EVID. 702 advisory committee's note to 2023 amendment; *see also id.* (explaining that the admissibility standard "does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis *always* go to weight and not admissibility") (emphasis added). Instead, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements[.]" *Id.* "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.* "Because the rule change was a clarification, and not a change in the standard, the new language does not materially alter the admissibility of expert testimony." *Alivecor, Inc. v. Apple, Inc.*, No. 21-cv-03958-JSW, 2024 WL 591864, at *3 n.2 (N.D. Cal. Feb. 13, 2024) (citation omitted).

### B.    Analysis

#### 1.    Dr. Okoye

Plaintiffs rely on a second autopsy performed by Dr. Okoye. (*See generally* Dr. Okoye Decl.) Defendants move to exclude Dr. Okoye's declaration on the ground that it "fails to

PAGE 19 – OPINION AND ORDER

provide any useful evidence that [] Clark's injuries were, more probably than not, repairable and survivable." (Cnty. Defs.' Reply at 11.) Trooper Cole also argues that Dr. Okoye's opinion that Clark's chances of survival were significant is ambiguous and irrelevant to show causation under Section 1983 and his claim that Clark can be heard moaning ten minutes after he was shot is unsupported by the body camera video. (Trooper Cole's Mot. at 4.) Trooper Cole further argues that Dr. Okoye's citation to Dr. Millius's grand jury testimony in a different case is "completely devoid of context[.]" (*Id.* at 3.)

Plaintiffs respond that "[a] fair reading of the declaration with inferences resolved in favor of the Plaintiffs creates a fact question on survivability if [Clark] had received prompt medical treatment." (Pls.' Sur-Reply Cnty. Defs.' Mot. Summ. J. ("Pls.' Sur-Reply Cnty. Defs.") at 6, ECF No. 221; *see also* Pls.' Sur-Reply Trooper Cole's Mot. Summ. J. ("Pls.' Sur-Reply Trooper Cole") at 3-4, ECF No. 222.) Plaintiffs also assert that just because Trooper "Cole does not hear moaning on only one of the many body[-]worn videos in this case does not mean none of the videos contain it[.]" (Pls.' Sur-Reply Trooper Cole at 3.)

The Court concludes that Dr. Okoye's testimony is supported by a sufficiently reliable basis and Defendants' objections go to the weight of Dr. Okoye's opinion, not its admissibility. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]") (simplified); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("Although Defendants . . . argued that [the expert]'s selection of documents to review went to the reliability of his 'methodology' as an expert, the

PAGE 20 – OPINION AND ORDER

district court correctly surmised that questions regarding the nature of [the expert]'s evidence went more to the 'weight' of his testimony—an issue properly explored during direct and cross-examination." (citing *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004))); *OWLink Tech., Inc. v. Cypress Tech. Co.*, No. 8:21-cv-00717-SPG-KESX, 2023 WL 4291486, at *1-2 (C.D. Cal. Feb. 16, 2023) (rejecting the defendant's argument that expert testimony should be excluded because the expert "failed to conduct an adequate independent investigation because he relied on summaries of data provided by the parties" and concluding that the defendant's argument goes to the weight of the testimony, not its admissibility).

### 2.     Bercovici and Rodriguez

Defendants also move to exclude Bercovici's and Rodriguez's declarations on the ground that they "are insufficient to meet the requirements of [Rule] 702 for reliable and relevant testimony and therefore should be disregarded by this court." (Trooper Cole's Reply at 7-9; *see also* Cnty. Defendants' Reply at 11-15.) Specifically, Defendants argue that Bercovici's and Rodriguez's declarations are "nearly identical" and raise an inference that "[P]laintiffs' counsel improperly drafted both opinions." (Cnty. Defs.' Reply at 11; *see also* Trooper Cole's Reply at 8-9.) Trooper Cole further argues that both declarations "ignore or contradict undisputed evidence in the record." (Trooper Cole's Reply at 8.) The County Defendants also argue that both declarations are based on improper legal conclusions and that it is not clear what methods the individuals relied on to reach their conclusions. (Cnty. Defs.' Reply at 6-7.)

Again, the Court concludes that Defendants' objections go to the weight of the declarations rather than their admissibility. Both Bercovici and Rodriguez explain their experience, expertise, and the bases for their conclusions. (*See* Bercovici Decl. at 2-9; Rodriguez Decl. at 2-9.) With respect to their use of legal terms in the declarations, "[t]he line between expert opinion on an ultimate issue of fact and a legal conclusion is fine" and "an expert can

PAGE 21 – OPINION AND ORDER

testify to an issue of law, but not express an opinion on a conclusion of law." *Est. of Lefthand through Lefthand v. Tenke*, 646 F. Supp. 3d 1287, 1292 (D. Mont. 2022) (citing *Ford v. Allied Mut. Ins. Co.*, 72 F.3d 836, 841 (10th Cir. 1996). "Further, an expert may refer to the law in expressing an opinion without crossing the line into a legal conclusion." *Kalani v. Starbucks Corp.*, 81 F. Supp. 3d 876, 882 (N.D. Cal. 2015) (citation omitted), *aff'd* 698 F. App'x 883 (9th Cir. 2017). Here, both experts state that they "use these [legal] terms in [their] training of police supervisors, managers, and command officers when instructing them on administrative investigations and civil liability." (Rodriguez Decl. at 8; Bercovici Decl. at 7.) The Court concludes that Bercovici and Rodriguez expressed opinions on issues of fact using industry terms that mirror the applicable legal standards and did not cross the line into legal conclusions. *Cf. Hangarter,* 373 F.3d at 1017 (holding that an expert's "testimony did not improperly usurp the court's role by instructing the jury as to the applicable law"). In any event, Defendants may file motions in limine to address their concerns about how the experts' conclusions are presented to the jury.

In addition, "[t]he fact that counsel helped with preparation of an expert report goes to the weight to be accorded to the opinions, rather than admissibility." *Gerke v. Travelers Cas. Ins. Co. of Am.*, 289 F.R.D. 316, 326 (D. Or. 2013). "Others may assist in the preparation of the report but the expert must freely authorize and adopt the changes as his or her own, and the final report must be that of the expert." *Id.* While the fact sections in Bercovici's and Rodriguez's declarations are very similar, there is nothing in the evidentiary record to suggest that they did not authorize or adopt the language in their respective reports.

For these reasons, the Court denies Defendants' requests to exclude the expert declarations.

## II.    EXCESSIVE FORCE

Plaintiffs assert excessive force claims against Deputy Ferguson and Trooper Cole for using deadly force against Clark, as well as an excessive force claim against "Defendants who threw explosives at" Clark.[5] (TAC ¶¶ 173-74.)

### A.    Applicable Law

"A police officer's use of . . . force on a person [is] a seizure subject to the [reasonableness requirement of the] Fourth Amendment."[6] *Hyer v. City & County of Honolulu,* 118 F.4th 1044, 1060 (9th Cir. 2024) (citing *Graham v. Connor,* 490 U.S. 386, 388 (1989)). In evaluating a "claim of excessive force, [courts] ask whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them." *Williamson v. City of Nat'l City,* 23 F.4th 1146, 1151 (9th Cir. 2022) (simplified) (quoting *Rice v. Morehouse,* 989 F.3d 1112, 1121 (9th Cir. 2021)); *see also Sabbe v. Wash. Cnty. Bd. of Comm'rs,* 84 F.4th 807, 821 (9th Cir. 2023) (stating that *Graham* "provides the framework that governs this part of [the analysis]"). Only information available to the officers at the time of the incident is relevant. *County of Los Angeles v. Mendez,* 581 U.S. 420, 428 (2017); *Glenn v. Washington County,* 673 F.3d 864, 873 n.8 (9th Cir. 2011). Additionally, the Fourth Amendment does not require that police officers "use the least intrusive degree of force possible[.]" *Lowry v. City of San Diego,* 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc) (simplified).

Courts engage in a three-part inquiry to "determine whether an officer's actions were objectively reasonable[.]" *Williamson,* 23 F.4th at 1151; *see also Ramsey v. City of Lake Havasu*

---

[5] At oral argument, Plaintiffs represented that they were abandoning their excessive force claim arising from the dog bite.

[6] Plaintiffs represented during conferral that they are not proceeding on their alleged excessive force claims under the Fourteenth Amendment. (*See* TAC ¶¶ 173-74.)

PAGE 23 – OPINION AND ORDER

*City,* No. 23-3244, 2025 WL 66048, at *1 (9th Cir. Jan. 10, 2025) (recognizing that this circuit "approach[es] an excessive force claim in three stages" (quoting *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018))). First, courts consider "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted[.]" *Williamson,* 23 F.4th at 1151 (quoting *Rice*, 989 F.3d at 1121); *Thompson*, 885 F.3d at 586 (same). Second, courts consider "the government's interest in the use of force[.]" *Williamson,* 23 F.4th at 1151 (quoting *Rice*, 989 F.3d at 1121). Third, courts consider "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Id.* (quoting *Rice*, 989 F.3d at 1121). Ultimately, courts must "judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]'" *id.* (quoting *Rice*, 989 F.3d at 1121, which quoted *Graham*, 490 U.S. at 396), and keep in mind that "police officers 'are not required to use the least intrusive degree of force possible.'" *Id.* (quoting *Lowry*, 858 F.3d at 1256).

The Ninth Circuit has held that "summary judgment should be granted sparingly in excessive force cases." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc). "This principle applies with particular force where . . . the only witness other than the officers was killed during the encounter." *Id.* "In such cases, [courts] must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Id.*; *see also Torres v. City of Madera,* 648 F.3d 1119, 1125 (9th Cir. 2011) (holding that "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly") (simplified) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002))).

///

PAGE 24 – OPINION AND ORDER

B.    **Analysis**

1.    **Deputy Ferguson and Trooper Cole**

The County Defendants and Trooper Cole move for summary judgment on the grounds that Deputy Ferguson's and Trooper Cole's use of deadly force was reasonable under the circumstances.[7] (Cnty. Defs.' Mot. Summ. J. at 32; Trooper Cole's Mot. at 15-24.) Plaintiffs disagree. (Pls.' Resp. Cnty. Defs.' Mot. Summ. J. ("Pls.' Resp. Cnty. Defs.") at 14, ECF No. 202; Pls.' Resp. Trooper Cole's Mot. Summ. J. ("Pls.' Resp. Trooper Cole") at 5-12, ECF No. 203.)

a.    **Type and Amount of Force**

The Court must first consider the severity of the intrusion on Clark's Fourth Amendment rights. *See Williamson*, 23 F.4th at 1151 (identifying this initial step in a court's inquiry). "To gauge the type and amount of force used, [courts] assess both 'the risk of harm and the actual harm experienced.'" *Sabbe*, 84 F.4th at 821 (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)). In considering the "specific factual circumstances" and "classifying the force used," courts also assess the "nature and degree of physical contact[.]" *Williamson*, 23 F.4th at 1151-52 (stating that these matters are "relevant to th[e] analysis" (first quoting *Lowry*, 858 F.3d at 1259; and then citing *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994))).

"The intrusiveness of a seizure by means of deadly force is unmatched." *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 915 (9th Cir. 2024) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Like its sister circuits, the Ninth Circuit has "defined 'deadly force' as any force that '*creates a substantial risk* of causing death or serious bodily injury." *Sabbe*, 84 F.4th

---

[7] The Court addresses Defendants' qualified immunity arguments in a single section below.

PAGE 25 – OPINION AND ORDER

at 821 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (en banc)). Deadly

force is considered "the most severe intrusion on Fourth Amendment interests because a person

has a 'fundamental interest in his own life.'" *Id.* (quoting *Garner*, 471 U.S. at 9). When an

officer uses deadly force, a court's "inquiry reduces to 'whether the governmental interests at

stake were sufficient to justify it.'" *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir.

2024) (quoting *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018)).

Here, the parties do not dispute that Deputy Ferguson and Trooper Cole used deadly

force. (*See* Cnty. Defs.' Mot. at 29, stating that "Deputy Ferguson's use of deadly force was

reasonable"; Trooper Cole's Mot. at 19, stating that "it did not violate Clark's Fourth

Amendment rights [for Trooper Cole] to use deadly force"; Pls.' Resp. Trooper Cole at 5,

"Trooper Cole's use of deadly force was not reasonable"; Pls.' Resp. Cnty. Defs. at 14,

"[Deputy] Ferguson's use of deadly force was not reasonable").

### b.    Government Interest

"The Supreme Court's decision in *Graham* identified several factors to consider when

evaluating the strength of the government's interest in the force used[.]" *Williams v. City of

Sparks*, 112 F.4th 635, 643 (9th Cir. 2024); *see also Hart*, 99 F.4th at 549 (applying the *Graham*

factors). The *Graham* factors are: "(1) 'the severity of the crime at issue,' (2) 'whether the

suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the

suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Williams*, 112 F.4th

at 643 (quoting *Graham*, 490 U.S. at 396). "The most important *Graham* factor is whether the

suspect posed an immediate threat to anyone's safety[,]" *id.* (quoting *Nehad v. Browder*, 929

F.3d 1125, 1132 (9th Cir. 2019)), but the *Graham* "factors are not exclusive." *Id.* (citing *Bryan v.

MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Courts "still must 'examine the totality of the

circumstances and consider whatever specific factors may be appropriate in a particular case,

PAGE 26 – OPINION AND ORDER

whether or not listed in *Graham*.'" *Id.* (quoting *Bryan*, 630 F.3d at 826). Such "factors may include the availability of less intrusive force [or] whether proper warnings were given[.]" *Id.* (quoting *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017)).

### 1)    Immediate Threat

The Court first addresses whether Clark posed an immediate threat to Deputy Ferguson's and Trooper Cole's safety. *See Hart*, 99 F.4th at 549 (beginning with the "most important factor" of whether the decedent "posed an immediate threat to [the] [o]fficer" who used deadly force) (simplified); *Napouk*, 123 F.4th at 915 (same). The County Defendants argue that "it was constitutionally reasonable for Deputy Ferguson to fear for the immediate safety of Trooper Cole and the people who lived nearby based on what he perceived[.]" (Cnty. Defs.' Mot. at 40.) Trooper Cole argues that Clark posed an immediate threat because "Clark had a gun in his right hand that was pointed at the Trooper when Clark opened the car door." (Trooper Cole's Mot. at 18.) Plaintiffs respond "that a person running away from officers with a gun and who has already made it some distance away from them, but who has not threatened the officers with that gun at all, does not pose an immediate threat to the officers." (Pls.' Resp. Cnty. Defs.' at 14.) Plaintiffs also argue that "[t]here is no question that a person running away from officers with a gun and who has already made it some distance away from them, but who has not threatened the officers with that gun at all, does not pose an immediate threat to the officers." (Pls.' Resp. Cnty. Defs.' at 16, citing *Gelhaus*, 871 F.3d at 1006.)

In *Gelhaus*, the decedent, an adolescent holding a toy gun that resembled an AK-47, was walking away from the officers. *See Gelhaus*, 871 F.3d at 1006. An officer yelled at the decedent to drop the gun, at which point the decedent turned around. *Id.* at 1002-03. The officer then shot his firearm, killing the decedent. *Id.* at 1003. The defendants claimed that the decedent "partially raised" the gun while the plaintiffs asserted that it remained "pointed down at the ground." *Id.*

PAGE 27 – OPINION AND ORDER

The Court resolved this dispute in the decedent's favor at the summary judgment stage, concluding that "the gun barrel might have raised slightly[.]" *Id.* at 1010. The Court concluded that "a reasonable jury could find that [the officer's] use of deadly force was not objectively reasonable." *Id.* at 1013.

The County Defendants argue that "[t]he Fourth Amendment did not require Deputy Ferguson to delay his fire until he learned whether it was in fact [] Clark who had shot his gun, until [] Clark turned and pointed his gun at law enforcement, until [] Clark began shooting, or until [] Clark took a hostage in the adjacent neighborhood." (Cnty. Defs.' Mot. at 39, citing *Est. of Strickland v. Nevada County*, 69 F.4th 614 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024)). In *Estate of Strickland*, the Ninth Circuit "examine[d] whether it was objectively reasonable for officers to believe a black toy airsoft rifle pointed in their direction presented an immediate threat justifying the use of deadly force" and "based on the facts [presented], . . . sa[id] yes." *Est. of Strickland*, 69 F.4th at 617. The Ninth Circuit observed at the outset that (1) the decedent was "known to officers as homeless and mentally ill" and "obvious[ly] . . . suffering from a mental health crisis," (2) the "officers were responding to reports of a man walking in the neighborhood with a shotgun, [but the decedent] was not under suspicion for committing a serious or dangerous crime," (3) "[a]t the start of the confrontation with police, [the decedent] had not yet brandished the gun at anyone or threatened the life or property of others," and (4) the officers "failed to employ de-escalation techniques" and "seemingly exacerbated the situation by aggressively shouting directions at [the decedent] upon their arrival." *Id.* at 619-20. Although these facts supported that the "bulk of the *Graham* factors favor[ed]" the decedent, the Ninth Circuit held that the "immediacy of the threat that [the decedent] posed outweigh[ed] those considerations" because officers "only had an instant to act." *Id.* at 620, 623. The Ninth Circuit

PAGE 28 – OPINION AND ORDER

emphasized that "[t]he pivotal moment [that justified deadly force] occurred when [the decedent] began pointing the replica gun in the officers' direction." *Id.* at 621.

Here, whether this case is more like *Gelhaus* or *Strickland* depends in large part on whether Clark pointed his gun at Trooper Cole and whether Deputy Ferguson reasonably believed that Clark had pointed or fired his gun at Trooper Cole. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (holding that when an individual points a gun at a police officer, the Fourth Amendment "undoubtedly entitles the officer to respond with deadly force"); *cf. Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (affirming summary judgment where under a witness' "version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because [the decedent] did not point the gun at the officers and apparently was not facing them when they shot him the first time"). There are genuine issues of disputed material facts on these issues in the summary judgment record.

Specifically, Deputy Ferguson admits that Clark never pointed a gun at him. (Deputy Ferguson Dep. at 107:8-9, 118:8-9.) There is conflicting evidence as to whether Deputy Ferguson believed that Clark pointed his gun or shot at Trooper Cole. On one hand, Deputy Ferguson now alleges that "as Clark opened his door and quickly exited[,]" he saw Clark "holding an object in his right hand that [Deputy Ferguson] believed may have been a gun." (Deputy Ferguson Decl. ¶ 12.) Deputy Ferguson also states that he "heard a single gunshot" and "feared that [] Clark had shot, or shot at, Trooper Cole." (*Id.*) On the other hand, "when Sergeant Heimbuck and another CCSO deputy asked Deputy Ferguson [at the scene] if [] Clark had fired any shots, [Deputy] Ferguson said: 'I don't think he did.'" (Bercovici Decl. at 9; *see also* Rodriguez Decl. at 11.)

PAGE 29 – OPINION AND ORDER

The County Defendants argue that "it is *not* the law that an armed individual can pose a threat *only* when that person brandishes the weapon in a 'threatening manner.'" (Cnty. Defs.' Mot. at 30, quoting *Napouk*, 123 F. 4th at 917.) In *Napouk*, the Ninth Circuit re-affirmed its holding in *George* that "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Napouk*, 123 F. 4th at 917 (quoting *George*, 736 F.3d at 838). Here, Deputy Ferguson stated that he "saw [Clark] with the gun and [that] he was starting to run away" but acknowledged that Clark "never pointed the gun at [him] or made a furtive movement." (Deputy Ferguson Dep. at 107:8-9.) There is nothing in the evidentiary record to suggest that Clark made any verbal threats, serious or otherwise, and reasonable jurors could disagree as to whether Clark's flight path in front of Trooper Cole's qualifies as a harrowing gesture. For these reasons, there is a genuine dispute of material fact as to whether Clark "posed an immediate threat" to Deputy Ferguson. *Hart*, 99 F.4th at 549.

Officer Cole, on the other hand, has consistently reported that he saw the barrel of Clark's gun before he fired at Clark. (*See* Trooper Cole Dep. at 37:23-25, stating that he saw "the barrel of [Clark's] gun for a split second when [Clark] exited the vehicle"; Det. Wadsworth Tr. at 25:1-12, "[The gun] was down by his hip but it was pointed directly in my direction . . . [and] I could see down the barrel[.]") The law is clear that when a person points a gun in a law enforcement officer's direction, the Constitution allows the officer to respond with deadly force. *See George*, 736 F.3d at 838 ("'When an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force." (quoting *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007))); *see also Banks v. Mortimer*, 620 F. Supp. 3d 902, 932 (N.D. Cal. 2022) (stating that "the Ninth Circuit has held that it would be

PAGE 30 – OPINION AND ORDER

'unquestionably reasonable' for [the officer] to shoot a suspect that is pointing a gun at him" (quoting *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014))). If the jury believes Trooper Cole's version of events, Clark posed an immediate threat.

However, Plaintiffs assert that the evidence supports the contrary conclusion that Clark "never point[ed] his weapon at [Trooper] Cole." (Pls.' Resp. Trooper Cole at 6.) Trooper Cole cites his body camera footage as evidence that Clark pointed his gun at him. (*See* Trooper Cole's Mot. at 10, citing Trooper Cole Body-Worn Video at 12:54:41-12:54:44 a.m.) Nevertheless, at oral argument, Trooper Cole's counsel acknowledged that the video neither conclusively confirms nor disproves Officer Cole's statement that the barrel of Clark's gun was visible to him.[8] If the jury concludes that Clark did not point his gun at Officer Cole, the law supports a finding that Clark did not pose an immediate threat. *See, e.g., Green v. McNamara,* No. 24-1660, 2025 WL 2602602, at *3 (9th Cir. Sept. 9, 2025) (holding that a person did not pose an immediate threat where his gun was pointed in an "upward position" but "not aimed at any person"); *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1254 (9th Cir. 2016) (holding that a person did not pose an immediate threat where "the gun was pointed up with the butt on the ground"); *Gelhaus*, 871 F.3d at 1004 (holding that an individual did not pose an immediate threat where "the rifle barrel was beginning to rise . . . [but] started in a position where it was pointed down at the ground").

///

---

[8] Plaintiffs claim that "[i]f, as the State claims, [Trooper] Cole saw the gun pointed at him while [Clark] was getting out of the Pontiac, it would logically follow that that would be the point where [Trooper] Cole shot at [Clark]." (Pls.' Resp. Trooper Cole at 6.) However, Trooper Cole explains that when he saw Clark point his gun at him, he ducked behind his car for cover and that he believed Clark was coming around the front of Trooper Cole's vehicle to fire at him. (Trooper Cole Dep. at 14:21-25, Det. Wadsworth Tr. at 19:21-20:1; Trooper Cole Body-Worn Video at 12:54:41-12:54:44 a.m.)

PAGE 31 – OPINION AND ORDER

The Ninth Circuit has held that "the probative value of real-time videos and frozen frames is more appropriately a matter for a jury to view and evaluate, not a matter for a court to resolve on summary judgment." *Longoria v. Pinal County*, 873 F.3d 699, 706 (9th Cir. 2017) (holding that the ambiguities captured in the officers' body-cam videos "raise[] material questions of fact about the reasonableness of [the officers'] actions and the credibility of his post-hoc justification of his conduct"). Upon careful review of Trooper Cole's body-cam video, the Court finds that a reasonable juror could conclude that Clark did not point his gun at Trooper Cole and therefore did not pose an imminent threat. *See id.*; *see also Green*, 2025 WL 2602602, at \*1 (affirming denial of summary judgment on the plaintiffs' excessive force claim where the "videos of the [deadly force] incident are arguably consistent with [the plaintiff's] version of the incident and do not settle material disputes that only a jury or trier of fact can decide"); *Johnson v. Rogers*, 944 F.3d 966, 967, 969 (7th Cir. 2019) (holding that a "conclusive video allows a court to know what happened and decide the legal consequences," but a video that is "not wholly clear" can be relied on only for those facts that can be established "with confidence" and "beyond reasonable question").

### 2)    Severity of Crime and Attempts to Evade Arrest

The other two *Graham* factors instruct the Court to consider "'the severity of the crime at issue,' [and] 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Williams*, 112 F.4th at 643 (quoting *Graham*, 490 U.S. at 396). Courts use "the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *S.R. Nehad*, 929 F.3d at 1136.

Here, it is undisputed that Clark was actively attempting to evade arrest—first by vehicle and then by foot—as he fled from Deputy Ferguson and Trooper Cole, which weighs against

Clark. (*See* Rodriguez Decl. at 10:14-16; *see also* Ferguson Decl. ¶ 11; Trooper Cole Dep. at 12:14-17, 13:19-23, 56:2-4, Det. Wadsworth Tr. at 15:19-23, 17:4-7.)

With respect to the severity of the alleged crimes Clark was committing, Plaintiffs argue that a DUI or traffic offense are not severe offenses, and Defendants argue that Clark's felony attempt to elude and unlawful use of a weapon are serious offenses. (*See* Cnty. Defs.' Mot. at 33; Trooper Cole's Mot. at 19.) As discussed above, there is a genuine dispute of material fact with respect to whether Clark pointed his gun at Trooper Cole. Viewing the facts in the light most favorable to Plaintiffs and evaluating Clark's felony attempt to elude as his most serious offense, a reasonable juror could find that the "severity of the crime" factor weighs in factor of Clark. *See Sabbe*, 84 F.4th at 823-24 (holding that even though the suspect had attempted to elude officers in a vehicle and had committed a felony by illegally discharging a firearm, a reasonable juror could conclude that the "severity of the crime" factor weighed in favor of the plaintiff); *Glenn*, 673 F.3d at 874 (holding that because the suspect "was trying to get away" from officers, the severity of the crime factor weighed in favor of the plaintiff); *Mattos v. Agarano*, 661 F.3d 433, 444 (9th Cir. 2011) (holding that traffic offenses "do not constitute severe crimes in a *Graham* analysis");[9] *see also Est. of Pelaez Chavez v. County of Sonoma,* No. 22-cv-06715-DMR, 2024 WL 4805359, at *7 (N.D. Cal. Nov. 15, 2024) (denying summary judgment in part because there was a genuine dispute as to whether the decedent committed only non-violent crimes), *appeal dismissed, Est. of Chavez v. County of Sonoma,* No. 24-7561, 2025 WL 1675936 (9th Cir. June 6, 2025).

---

[9] The Ninth Circuit has held that arguably more serious crimes, such as domestic violence without a deadly weapon, are not severe crimes in a *Graham* analysis. *See Smith*, 394 F.3d at 702 (stating that "[a]lthough we are mindful of the seriousness and reprehensibility of domestic abuse, the circumstances are not such in this case as to warrant the conclusion that [the decedent] was a particularly dangerous criminal or that his offense was especially egregious").

PAGE 33 – OPINION AND ORDER

### c.    Balancing the Conflicting Interests

The Court's third and final consideration is "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson*, 23 F.4th at 1151.

On balance, viewing the facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor (i.e., Clark never pointed his gun at Trooper Cole or Deputy Ferguson, Deputy Ferguson did not reasonably believe that Clark had fired at Trooper Cole, and Clark did not engage in any furtive movements, harrowing gestures, or serious verbal threats), a reasonable jury could find that Deputy Ferguson's and Trooper Cole's uses of deadly force were excessive. *See Longoria*, 873 F.3d at 709 (denying summary judgment on the ground that the officer's "objective reasonableness in the totality of the circumstances depend upon the resolution of disputes of material facts that must be resolved against [the officer] at this stage of the proceedings"); *Gelhaus*, 871 F.3d at 1006 (finding that the plaintiffs "can demonstrate a constitutional violation assuming, again as we must at this stage of the proceedings, that factual disputes are resolved and reasonable inferences are drawn in [P]laintiffs' favor"). Alternatively, viewing the facts in the light most favorable to Defendants and drawing all reasonable inferences in their favor (i.e., Clark pointed his gun at Trooper Cole, Deputy Ferguson reasonably believed that Clark fired his gun at Trooper Cole, and Clark engaged in threatening movements by running across the front of Trooper Cole's vehicle with his gun in his outstretched hand), a reasonable jury could find that Deputy Ferguson's and Trooper Cole's uses of deadly force were reasonable.

For these reasons, the Court denies the County Defendants' and Trooper Cole's motions for summary judgment on Plaintiffs' excessive force claim with respect to the use of deadly force and denies Plaintiffs' motion for summary judgment on the same issue.

PAGE 34 – OPINION AND ORDER

### 2.    Deputy Sanders

Plaintiffs allege that "Defendants' use of a flash bang and stinger ball to coax [Clark] into surrendering was a seizure and a use of excessive force." (Pls.' Resp. Cnty. Defs.' at 18.) Defendants first argue that this claim is procedurally barred because "[P]laintiffs have not actually pleaded a Fourth Amendment excessive force claim against Deputy Sanders." (Cnty. Defs.' Mot. at 43, "Plaintiffs' complaint expressly indicates excessive force claims against Deputy Ferguson and Trooper Cole but does not mention Deputy Sanders at all.") The County Defendants also argue that by the time the flash bang and stinger ball were deployed, "there is no reasonable question that Mr. Clark was deceased and his Fourth Amendment rights could no longer be violated." (*Id.*) Finally, the County Defendants argue that the deployments of these devices were not a seizure, and even if they were, they were reasonable. (*Id.* at 44-47.)

### a.    Pleadings

Plaintiffs did not respond to Defendants' argument that they did not plead a Fourth Amendment excessive force claim against Deputy Sanders. (*See* Pls.' Resp. Cnty. Defs. at 18-20; Pls.' Reply Cnty. Defs.' Resp. Pl.'s Mot. Summ. J. ("Pls.' Reply Cnty. Defs."), ECF No. 210.)

"A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). Rule 8(a)(2) requires that the allegations in the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002) (quotation omitted).

Plaintiffs' operative complaint satisfies this requirement. In their TAC, Plaintiffs allege an excessive force claim against "Defendants who threw explosives at [Clark]" in Count Six. (TAC at 35.) Plaintiffs also clearly allege in the TAC that Deputy Sanders threw explosives at Clark. (*See id.* ¶¶ 116, 119, 127.) Accordingly, Deputy Sanders had fair notice of Plaintiffs'

PAGE 35 – OPINION AND ORDER

excessive force claim against him. *See Starr v. Baca*, 652 F.3d 1202, 1215 (9th Cir. 2011) (holding that the plaintiff's complaint satisfies the Rule 8(a) requirements because the complaint made "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively").

### b.    Time of Death

Defendants also move for summary judgment on Plaintiffs' Fourth Amendment claim against Deputy Sanders on the ground that Clark was already deceased when Deputy Sanders deployed the flash bang and stinger balls. (Cnty. Defs.' Mot. at 28-29, 43-44.) Plaintiffs respond that Section 1983's legislative history reflects that Congress intended to allow suits for actions and omissions against deceased individuals. (Pls.' Resp. Cnty. Defs.' at 12-13.) Plaintiffs also argue that "[t]he question of when and how [Clark] died is not a matter for judicial determination at summary judgment[.]" (*Id.* at 13.)

Contrary to Plaintiffs' suggestion, Section 1983 "does not provide a cause of action on behalf of a deceased person based on alleged violations of the deceased person's civil rights which occurred after his death." *United States v. Maciel-Alcala*, 612 F.3d 1092, 1097-98 (9th Cir. 2010); *see also Guyton v. Phillips*, 606 F.2d 248, 250 (9th Cir. 1979) (holding that "[t]here is no indication that Congress intended the Civil Rights Act to provide a cause of action for representatives to recover on behalf of a deceased for actions committed after the deceased's death"); *Cole v. Oravec*, No. CV-09-21-BLG-SEH-CSO, 2014 WL 2918314, at *7 (D. Mont. June 26, 2014) (holding that "nothing in the Civil Rights Act's legislative history indicates that Congress intended to deviate from the general meaning of the word 'person' as it is used in [Section] 1983"), *aff'd in part, rev'd in part on different grounds,* 700 F. App'x 602 (9th Cir. 2017).

///

PAGE 36 – OPINION AND ORDER

Nevertheless, there is a genuine dispute of material fact as to Clark's time of death. The County Defendants argue that "there is no reasonable question that [] Clark was deceased" when Deputy Sanders deployed "a flash bang and a stinger ball . . . [at] approximately 2:31 am and 2:38 am, respectively." (Cnty. Defs.' Mot. at 33.) The County Defendants state that "during conferral [P]laintiffs' counsel acknowledged that [] Clark was deceased by 2:52 am when Deputy McCafferty deployed his canine[.]" (*Id.*) Accordingly, the County Defendants claim that Plaintiffs "paint themselves in a difficult corner as they must produce evidence that [Clark] lived for over an hour-and-a-half from the time he was shot until Deputy Sanders deployed the two devices but then died precisely within the fourteen-minute window between [Deputy] Sanders' use of the devices and [Officer] McCafferty's use of the dog." (*Id.* at 43-44.)

The summary judgment record reflects that Clark's "cause of death [was] a penetrating gunshot wound of the posterior lateral aspect of the right side of the chest." (Dr. Millius Decl. ¶ 5; *see also* Dr. Okoye Decl., Ex. I ¶ 15, "The cause of death of [] Clark is a gunshot wound to the posterior-lateral aspect of the right chest area."). Dr. Millius, "a Forensic Pathologist employed as a Deputy State Medical Examiner with the Oregon State Medical Examiner[,]" opines that Clark "suffered cardiac death, the irreversible cessation of cardiac activity, within several seconds after receiving this injury[, l]oss of consciousness would have occurred within approximately [twenty] seconds after injury due to lack of delivery of blood and oxygen to the brain[, and b]rain death, the irreversible cessation of brain and brainstem function, would have ensued within [five] to [six] minutes after injury." (*Id.*) Dr. Millius concluded "that the injury caused by [Clark's] gunshot wound was rapidly fatal and was not survivable[.]" (*Id.* ¶ 11.) Nevertheless, in her autopsy report, Dr. Millius also states that the dog bite wounds were "inflicted immediately before or just after death." (Dr. Millius Decl. at 9; *see also id.* at 4, "the

PAGE 37 – OPINION AND ORDER

wounds would appear the same if they occurred right as [] Clark's heart stopped beating or two hours after death, so long as decomposition had not begun.")

Dr. Okoye, a practicing physician who conducted a second autopsy on Clark, concluded that "[t]he injury to [] Clark's lung, characterized by a hole and bruising, was serious but not . . . sufficient to cause immediate death." (Dr. Okoye Decl. Ex. I ¶ 18(b).) Dr. Okoye also notes that "Clark can be heard moaning on the police officer's body cam approximately [ten] minutes after he was shot." (*Id.* ¶ 18(f)). Plaintiffs argue that "no one knows when [Clark] died." (Pls.' Resp. Cnty. Defs. at 11.)

Based on the evidentiary record before the Court, a reasonable juror could arguably conclude that Clark was still alive when Deputy Sanders deployed the flash bang and stinger balls. Although Dr. Millius concludes that Clark passed away almost immediately upon being shot, Plaintiffs' expert claims that Clark could have remained alive for longer, and Dr. Millius' report also suggests that Clark may have been alive until just prior to the dog bite at 2:52 a.m. In light of the genuine dispute of material facts regarding the timing of Clark's death, the Court denies Defendants' motion for summary judgment on the ground that Clark was deceased at the time of Deputy Sanders' use of force.[10]

### c.     Seizure

The County Defendants move for summary judgment on Plaintiffs' Fourth Amendment excessive force claim against Deputy Sanders on the ground that deployments of the flash bang and stinger balls were not seizures. (Cnty. Defs.' Mot. at 44-47.) Plaintiffs disagree. (Pls.' Resp. Cnty. Defs. at 18-20.)

---

[10] For the same reasons, the Court denies Plaintiffs' motion for summary judgment on the County Defendants' affirmative defenses that Plaintiffs cannot proceed with claims based on violations that took place after Clark died and that no medical aid could have saved Clark's life. (*See* Pls.' Mot. Summ. J. Cnty. Defs. at 31.)

PAGE 38 – OPINION AND ORDER

Defendants cite two Ninth Circuit cases to support their argument that Deputy Sanders' deployments of the devices were not seizures under the Fourth Amendment: *Cheairs v. City of Seattle*, 145 F.4th 1233 (9th Cir. 2025) and *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). (Cnty. Defs.' Mot. at 44-46.) Plaintiffs point to *Headwaters* and argue that "chemical irritants and explosives intended to make someone move so they can be arrested constitute a use of force." (Pls.' Resp. Cnty. Defs.' at 18-19, *citing Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002)).

In *Cheairs*, the plaintiff asserted, *inter alia*, a Fourth Amendment excessive force claim based on a law enforcement officer's use of intermediate force at a protest in Seattle. *See Cheairs*, 145 F.4th at 1235. The protest in *Cheairs* had "devolved into 'a riot'" with "[s]ome protesters . . . holding plywood shields with nails in them concealed by paint, and . . . throwing bottles, rocks, and fireworks at the police line." *Id.* at 1237. "Using a public address system, [the Seattle Police Department] broadcast several orders for the crowd to immediately disperse" and "warned those in the crowd that they would be subject to arrest [and the use of chemical agents or less-lethal munitions] if they did not comply." *Id.* at 1237-38. "The police ordered the crowd to disperse, and an officer threw several less-lethal munitions toward the crowd[,]" including "a blast ball grenade, a diversionary device that creates a flash of light and emits a loud sound and a chemical irritant two seconds after it is activated." *Id.* at 1235. "The blast ball hit the pavement near the curb where [the plaintiff] was standing, bounced, and exploded as it struck him in the groin" and "[the plaintiff] was seriously injured." *Id.*

The Ninth Circuit held that a reasonable juror could conclude that the device constituted a seizure because "the blast ball that injured [the plaintiff] is capable of inflicting very serious injury—if not by design, then if used in the way we have described." *Id.* at 1243. Specifically,

PAGE 39 – OPINION AND ORDER

"[t]hrown overhand . . . a blast ball presents a greater risk of injury if it detonates at head level, and [the officer] threw the device in the direction of the crowd." *Id.* Nevertheless, the County Defendants distinguish *Cheairs* on the ground that there is no evidence that Clark was seriously injured by the flash bang or stinger balls. (Cnty. Defs.' Mot. at 45.)

In *Puente*, three separate protestors asserted, *inter alia*, Fourth Amendment excessive force claims based on three different uses of intermediate force at a protest in Phoenix. *See Puente*, 123 F.4th at 1057-62. The Ninth Circuit concluded that deployment of these devices did not constitute seizures because the plaintiffs "produced no evidence that the chemical deployments at issue here were undertaken with an objective intent to restrain, such as, for example, by targeting an immobilizing level of force at selected individuals . . . [and did] not show that the deployments somehow resulted in any submission to the officers' show of force, which arguably would have constituted a seizure from a show of authority." *Id.* at 1053.

In *Headwaters*, by contrast, environmental activists brought a Section 1983 action against the county and county sheriff's department, city and city's police department, and individual officers, alleging that use of pepper spray on activists during three peaceful protests was use of excessive force in violation of their Fourth Amendment rights. *See Headwaters*, 276 F.3d at 1125. The Ninth Circuit reversed the district court's grant of summary judgment on the ground that "viewing the evidence in the light most favorable to the protestors, a rational juror could conclude that the use of pepper spray against the protestors constituted excessive force and that [the officers] were liable for the protestors' unconstitutional injury." *Id.* at 1129-30.

The County Defendants argue that this case "is controlled by *Puente* in that there is no evidence indicating Deputy Sanders was attempting to restrain [] Clark, and there is no indication of any injury to [] Clark caused by the devices." (Cnty. Defs.' Mot. at 45.) The Court

PAGE 40 – OPINION AND ORDER

disagrees. In *Cheairs*, the Ninth Circuit made clear that an "officer's subjective intent is not the focus of [a] Fourth Amendment analysis[.]" *Cheairs,* 145 F.4th at 1240; *see also Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (holding that "[t]he intent that counts under the Fourth Amendment is the intent conveyed, not the officers' subjective intent"). Accordingly, the assertion that Sanders "threw the devices not with the intention of restraining [] Clark in any way, but for the opposite reason—to cause him to move" is not dispositive. (Cnty. Defs.' Mot. at 25.)

Instead, the Ninth Circuit has held that "there can be no reasonable dispute that 'incapacitating' an individual by firing a projectile at them is an act that 'meaningfully interferes' with their freedom of movement." *Sanderlin v. Dwyer*, 116 F.4th 905, 913 (9th Cir. 2024) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984)). Incapacitation includes "when officers use[] force to restrict the ability of individuals to move about freely, even if for a brief period of time, and where the force was not applied to effectuate an arrest." *Cheairs,* 145 F.4th at 1240 (simplified); *see also Brower v. County of Inyo,* 489 U.S. 593, 597 (1989) (holding that a seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied").

Deputy Sanders testified that a "flash-bang device is capable of causing burns if it is deployed on top of a person" and that "its purpose is to create a diversion by emitting a loud bang and bright flash of light that causes temporary distraction or disorientation." (Deputy Sanders Decl. ¶ 10.) A "stinger ball is similar to the flash-bang device . . . but it also deployed a number of small rubber balls." (*Id.* ¶ 11.) The device can "result in general discomfort and potentially bruising or welts, but its purpose is to irritate, distract, and disorient a subject." (*Id.*)

PAGE 41 – OPINION AND ORDER

The Court concludes that the deployments of both devices in this context were seizures within the Fourth Amendment. A device deployed to force an individual to move has the intent and design to "restrict the ability of individuals to move about freely[.]" *Cheairs,* 145 F.4th at 1240 (simplified). Like the device in *Cheairs*, the flash bang and stinger ball were "capable of causing serious injury." *Cheairs,* 145 F.4th at 1242. Additionally, like *Cheairs*, the officers' conduct was intentional and aimed toward Clark. *See id.* (citing *Nelson*, 685 F.3d at 875).

Unlike in *Puente* where the officers deployed the devices with the purpose of dispersal only, Deputy Sanders deployed the flash-bang and stinger ball with the purpose of causing Clark "to move and/or comply with commands to come out of his hiding spot in the bushes." (Deputy Sanders Decl. ¶ 13.) This is more akin to an effort to detain, which the Ninth Circuit recognized as a basis for seizure in *Puente*. *See Puente*, 123 F. 4th at 1053. Accordingly, the Court finds that Deputy Sanders' deployments of the flash bang and stinger ball were seizures within the meaning of the Fourth Amendment.

### d.    Excessive Force

The County Defendants also argue that "[e]ven if a seizure may have occurred, Deputy Sanders' use of the flash bang and stinger ball were reasonable in light of the totality of circumstances." (Cnty. Defs.' Mot. at 46.) Plaintiffs respond that "a reasonable officer on scene would have known that [Clark] was incapacitated at the time Defendants deployed the flash bang and stinger ball." (Pls.' Resp. at 19.)

### 1)    Type and Amount of Force

The County Defendants claim that Deputy Sanders' deployment of these devices "resulted in, at most, minor intrusions" on Clark's Fourth Amendment rights. (Cnty. Defs.' Mot. at 46.) The use of devices such as a stinger ball and the flash bang generally qualifies as intermediate force. *See Anti Police-Terror Project v. City of Oakland,* 477 F. Supp. 3d 1066,

PAGE 42 – OPINION AND ORDER

1086 (N.D. Cal. 2020) (holding that deployment of flash bang grenades constitutes "intermediate force"); *cf. Young v. County of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (holding that pepper spray is "'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests"); *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (holding that a lead-filled beanbag round is not deadly force but is "much greater than the force" associated with the use of pepper spray and is "permissible only when a strong governmental interest compels the employment of such force").

### 2)    Government Interest

The County Defendants argue that Deputy Sanders had a strong interest in deploying the devices because he "believed the subject was hiding in the bushes to avoid capture or to ambush deputies, and that it was not safe for law enforcement to advance toward him with the limited information they had." (Cnty. Defs.' Mot. at 46.) Defendants also note that "Deputy Sanders did not know whether the subject had fired at law enforcement" and that he "did not know whether the subject was still armed with another gun or a different weapon such as a knife." (*Id.*)

The Court first addresses whether Clark posed an immediate threat to Deputy Sanders' safety. *See Hart*, 99 F.4th at 549 (beginning with the "most important factor" of whether the decedent "posed an immediate threat to [the] [o]fficer" who used deadly force) (simplified); *Napouk*, 123 F.4th at 915 (same). "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281.

In *Deorle*, an officer who deployed a lead-filled beanbag testified that "he shot [the plaintiff] to prevent the latter from passing him and thereby posing a menace to [the sheriff], the public and other officers." *Id.* When the officer shot the projectile, he knew that the plaintiff "had discarded his crossbow following [an officer]'s instructions to do so, and carried only a bottle or

PAGE 43 – OPINION AND ORDER

a can with him at the time he was shot." *Id.* Additionally, "[d]uring the forty minutes, he had spent at the scene, [the officer] had not observed [the plaintiff] attack anyone; nor had he received any report that [the plaintiff] had engaged in any such conduct." *Id.* at 1281-82. The officer was also surrounded by many other law enforcement officials and "[n]othing in the record before us suggests that [the officer] considered other, less dangerous, methods of stopping [the plaintiff]." *Id.* at 1282.

Similarly here, Deputy Sanders justified deployment of the flash bang and stinger ball on the ground that he thought that "it was not safe for law enforcement to advance toward [Clark] with the limited information they had." (Deputy Sanders Decl. ¶ 16.) Deputy Sanders knew at the time of deployment that law enforcement had already "recovered" Clark's gun (*id.* ¶ 18), but he states he "did not know whether" Clark "was still armed with another gun or different weapon such as a knife." (*Id.*) However, Deputy Sanders was also aware that the drone had located Clark and captured no movement, the thermal image had detected cooling liquid next to Clark's body, and Clark had not moved for well over an hour. In addition, as in *Deorle*, there were several other law enforcement officials at the scene and Deputy Sanders failed to consider alternative, less dangerous measures. Accordingly, like in *Deorle*, there is a genuine dispute of material fact as to whether Clark posed an immediate threat when Deputy Sanders deployed the stinger ball and flash bang.

The other two *Graham* factors instruct the Court to consider "'the severity of the crime at issue,' [and] 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Williams*, 112 F.4th at 643 (quoting *Graham*, 490 U.S. at 396). Here, Deputy Sanders believed that Clark was trying to evade arrest by "hiding in the bushes[.]" (Deputy Sanders Decl.

PAGE 44 – OPINION AND ORDER

16.) As discussed above, a reasonable juror could conclude that the severity of crime factor weighs in favor of Clark.

Considering the totality of circumstances when Deputy Sanders deployed the flash bang and stinger grenades, there is a genuine dispute of material fact as to the government's interest in deploying intermediate force. *See Deorle*, 272 F.3d at 1282 ("Considering all the circumstances, at the time [the officer] fired, the governmental interest in using force capable of causing serious injury was clearly not substantial.").

### 3)     Balancing the Conflicting Interests

The Court's final consideration is "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson*, 23 F.4th at 1151. Viewing the facts in the light most favorable to Plaintiffs and resolving all reasonable inferences in their favor, a reasonable juror could conclude that Deputy Sanders was aware that Clark was injured, incapacitated, and dying and presented no immediate threat and that therefore deploying even intermediate force was excessive under the circumstances. Accordingly, the Court denies the County Defendants' motion for summary judgment.[11]

///

///

///

---

[11] The County Defendants also argue that "[t]here is no evidence of any injury to [] Clark as a result of either of Deputy Sanders' uses of force." (Cnty. Defs.' Mot. at 36.) The County Defendants argue that "the autopsy report [lacks] any indication of burns, welting, or bruising, or any other injury besides the bullet wounds and the dog bite." (*Id.*) The Court acknowledges the weakness of the evidentiary record with respect to any evidence of injury, but drawing all reasonable inferences in Plaintiffs' favor, Deputy Sanders' testimony that the devices landed right next to Clark (*see* Deputy Sanders Decl. ¶¶ 7, 9), Dr. Millius' autopsy report noting lacerations on Clark's skin (Dr. Millius Decl. Ex. 1), and Dr. Okoye's autopsy report noting some bruising on Clark's body (Hamoudi Summ. J. Decl., Ex. I ¶ 18(b)) are enough for a reasonable juror to find that the projectiles caused injuries to Clark.

PAGE 45 – OPINION AND ORDER

## III.    FAILURE TO RENDER AID

The County Defendants, Officer Mawson, and Trooper Cole move for summary judgment on Plaintiffs' Section 1983 claim for failure to provide medical aid to Clark in violation of his Fourteenth Amendment rights. (Cnty. Defs.' Mot. at 38-43; Officer Mawson Mot. at 7-8; Trooper Cole's Mot. at 18-21.) Plaintiffs respond that Defendants failed to render aid and "maintained the area around [Clark] as an active crime scene that medical personnel would never enter." (Pls.' Resp. Cnty. Defs.' at 20; *see also* Pls.' Resp. Alexander Mawson's Cross-Mot. Summ. J. ("Pls.' Resp. Officer Mawson") at 6-9, ECF No. 204); Pls.' Resp. Trooper Cole at 12-14.)

### A.    Applicable Law

"As a general rule, members of the public have no constitutional right to sue public employees who fail to protect them against harm inflicted by third parties." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) (quoting *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992)) (simplified). "An exception to the rule applies when government employees affirmatively place the plaintiff in a position of danger, that is, where their actions create or expose an individual to a danger which he or she would not have otherwise faced." *Id.* (simplified).

The "state-created danger" exception has two elements. *See Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023). First, there must be "affirmative conduct on the part of the state in placing the plaintiff in danger." *Id.* (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)). Second, the state must act "with deliberate indifference to a known or obvious danger." *Id.* (simplified); *see also id.* at 1117 n.16 ("The deliberate indifference standard is satisfied when a state actor 'recognizes the unreasonable risk and actually intends to expose the

PAGE 46 – OPINION AND ORDER

plaintiff to such risks without regard to the consequences to the plaintiff.'" (quoting *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996))).

### B.     Analysis

#### 1.     The County Defendants and Officer Mawson

The County Defendants move for summary judgment on the ground that "there is no evidence" to support Plaintiffs' allegation that the County Defendants "prevented medical providers from approaching [] Clark." (Cnty. Defs.' Mot. at 49.) The County Defendants also argue that it was reasonable for medical providers not to approach Clark when law enforcement officials believed that he may still be armed and that it was not clear that Clark required medical care. (*Id.* at 50-51.) Officer Mawson similarly argues that "summoning paramedics generally satisfies the constitutional requirement to render aid to an individual injured by police, even if the police do not perform first aid." (Mawson Mot. Summ. J. at 7-8.) Officer Mawson also claims that "Clark's injuries were not survivable even with surgical intervention at a level 1 trauma setting."[12] (*Id.* at 8.) Plaintiffs also move for summary judgment on their failure to render aid claims, arguing that medical intervention was possible. (Pls.' Mot. Summ. J. Officer Mawson at 13-16; Pl.'s Mot. Summ. J. Trooper Cole at 14; Pls.' Mot. Summ. J. Cnty. Defs. at 25-26.)

#### a.     Affirmative Conduct

The Court finds that a reasonable juror could conclude that the affirmative conduct of the County Defendants and Officer Mawson created a danger to Clark by impeding access to medical care.

///

---

[12] The Court does not consider this argument because it has already found that there is a genuine dispute of material fact as to Clark's time of death and whether his wounds were survivable.

PAGE 47 – OPINION AND ORDER

"To satisfy the [affirmative conduct] requirement, a plaintiff 'must show that the officers' affirmative actions created or exposed him to an actual, particularized danger that he would not otherwise have faced.'" *Est. of F.R. v. County of Yuba*, No. 2:23-cv-00846 WBS CKD, 2023 WL 6130049, at *2 (E.D. Cal. Sept. 19, 2023) (first quoting *Murguia*, 61 F.4th at 1111; and then citing *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019)).

The Ninth Circuit has made clear that "[o]fficers affirmatively place a person in danger by leaving her 'in a situation that [is] more dangerous than the one in which they found h[er].'" *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (citing *Munger v. City of Glasgow Police Dep't,* 227 F.3d 1082, 1086 (9th Cir. 2000)). "Impeding access to medical care amounts to leaving a victim in a more dangerous situation." *Id.* (citing *Penilla v. City of Huntington Park,* 115 F.3d 707, 710 (9th Cir. 1997)). Nevertheless, law enforcement may delay medical aid where an individual is dangerous and has ready access to firearms. *See Alford v. Humboldt County,* 785 F. Supp. 2d 867, 880 (N.D. Cal. 2011) (holding that officers did not violate the decedent's Fourteenth Amendment rights where it "was unsafe for fire personnel to approach, given that [the decedent] was in possession of firearms"); *Ely v. County of Santa Barbara*, No. CV206549DMGAGRX, 2021 WL 6752303, at *6 (C.D. Cal. Nov. 29, 2021) (holding that "if [the d]efendants were reasonable in believing that [the decedent] had a gun, then their decision to delay access to aid until after they had accounted for their own safety would also be reasonable").

Plaintiffs argue that "Defendants maintained the area around [Clark] as an active crime scene that medical personnel would never enter." (Pls.' Resp. Cnty. Defs.' at 14-15.) Plaintiffs claim that "no medical personnel would enter the scene before being told by officers that it was safe to do so" and that "it was not reasonable to believe that [Clark] was a threat to anyone

PAGE 48 – OPINION AND ORDER

during this time given that drone footage showed he had not moved at all." (*Id.* at 15-16, 22.) Defendants argue that there is no evidence to support Plaintiffs' allegation that the "individual defendants somehow prevented medical providers from approaching [] Clark to provide care[.]" (Cnty. Defs.' Mot. at 49.)

The summary judgment record reflects that after Trooper Cole fired his last shot at Clark, he called for medical assistance and asked them to stage nearby. (Trooper Cole Dep. at 96:21-23, 97:7-8; *see also* Det. Wadsworth Tr. at 27:1-2.) Trooper Cole did not hear anyone else at the scene "discuss or call for medical assistance[.]" (*Id.* at 43:8-10.) The County Defendants knew that Trooper Cole and Deputy Ferguson had fired at Clark as he was fleeing (*see* Trooper Cole Dep. at 43:11-17), but there is no evidence in the record that any of the officers on scene knew whether or not Clark had been shot.

At around 1:00 a.m., the remaining individual County Defendants (with the exception of the SWAT Defendants) arrived at the scene and did not render any aid to Clark. (*See* Officer Clark Decl. ¶ 3.) At around 1:10 a.m., officers launched a drone that "showed a very clear thermal signature that appeared to be of a human being, which they recognized as [] Clark." (Rodriguez Decl. at 12; *see also* Deputy Ferguson Tr. at 85-86.) Officer Zaitz told Officer Tooze that "there had been no movement at all." (Officer Clark Body-Worn Video at 1:32:53-1:33:25 a.m.; *see also id.* Deputy Ferguson Tr. at 85:25-86:2; Officer Sanders Dep. at 4:10-16; Rodriguez Decl. at 12.) Officers observed what appeared to be a pool of liquid surrounding the thermal signature that "was likely blood." (Rodriguez Decl. at 12; *see also* Clark Decl. ¶ 6; Tooze Decl. ¶ 6.) Officer Clark told Officer Tooze that the thermal imaging of the blood was getting lighter because the individual's blood was cooling. (Officer Clark Body-Worn Video at 1:34:10-1:34:34 a.m.) Officer Clark and Officer Tooze broadcast over the CCSO radio that the individual had not

PAGE 49 – OPINION AND ORDER

moved since the drone began monitoring. (*Id.* at 1:33:57-1:34:19 a.m; Officer Tooze Body-Worn

Video at 1:34:15-1:34:25 a.m.) The County Defendants circulated a screenshot of Clark's heat

signature to the CCSO. (Officer Clark Body-Worn Video at 1:38:10-1:38:30 a.m.) Finally,

Officer Clark told Officer Tooze that "I think your initial thought about the blood pool is

correct." (*Id.* at 1:39:20-1:39:25 a.m.) Some officers later said that they could not entirely

confirm the presence of this liquid with the drone. (Clark Decl. ¶ 6; Tooze Decl. ¶ 6.)

Officer Mawson saw the drone footage that showed Clark motionless and surrounded in a

pool of his own blood. (Officer Mawson Body-Worn Video at 2:25:40-2:25:59 a.m.) In addition,

Officer Mawson recovered Clark's gun. (Rodriguez Decl. at 12; Deputy Sanders Decl. ¶¶ 3-4;

Officer Robinson Decl. ¶¶ 10-11; Officer Mawson Decl. at 3, ECF No. 187; Officer Zaitz Decl. ¶

8; Officer Sanders Dep. at 3:10-25.)

The record reflects that each of the County Defendants and Mawson knew that medical

personnel was present at the scene. (Officer Tooze Decl. ¶ 8; *see also* Officer Kiesel Decl. ¶ 7;

Officer Taylor Decl. ¶ 7; Officer Clark Decl. ¶ 8; Officer Lang Decl. ¶ 7; Officer Heimbuck

Decl. ¶ 7; Officer McCafferty Decl. ¶ 23; Officer Zaitz Decl. ¶ 6; Officer Bento Decl. ¶ 7;

Officer Ferguson Decl. ¶ 7; Officer Reynolds Decl. ¶ 22; Officer Malizia Decl. ¶ 7; Officer

Brown Decl. ¶ 7; Officer Zacher Decl. ¶ 6; Officer Adler Decl. ¶ 6; Officer Hulsey Decl. ¶ 6;

Officer Robinson Decl. ¶ 6; Officer Castro Decl. ¶ 6; Officer Rogers Decl. ¶ 11; Officer Choe

Decl. ¶ 11; Officer Hancock Decl. ¶ 11; Officer Mawson Decl. at 4.) Despite their knowledge

that medical personnel were staged nearby and that Clark may be injured, no one permitted the

medics to approach and treat Clark. Additionally, in his expert report, Dr. Jeffrey Roger

explained that it is the role of law enforcement officers to declare areas secure before medical

staff can enter and offer assistance. (Decl. Andrew Campbell Supp. Def.'s Mot. Summ. J.

PAGE 50 – OPINION AND ORDER

("Campbell Decl.") Ex. 2 at 6, ECF No. 188.) Defendants have not presented any evidence to suggest that only certain officers had the authority to render aid or clear the scene, but in any event, the record reflects that no law enforcement officer at the scene attempted to render aid nor suggested that medical personnel render aid to Clark. Accordingly, each of the individual defendants on the scene (with the exception of Trooper Cole, discussed below) was "personally involv[ed]" in the alleged failure to provide medical care. *Bonivert v. City of Clarkston*, 883 F.3d 865, 879 (9th Cir. 2018).

In *Maxwell*, the Ninth Circuit held that there was a genuine dispute of material fact about whether the defendants violated the plaintiff's due process rights in a state-created danger case where police arrived at a crime scene, found the plaintiff "facing a preexisting danger from [a] gunshot wound[,]" and "affirmatively increased that danger by preventing her ambulance from leaving." *Maxwell,* 708 F.3d at 1082. The officers argued that the case was "distinguishable [from other state-created danger cases] because they did not involve first responders securing a crime scene." *Id.* The Ninth Circuit disagreed, stating that "[t]he existence of a crime scene does not change our analysis [because it] . . . was irrelevant to the delay of the ambulance." *Id.* at 1082-83. In particular, the Court noted that "[t]he ambulance contained no witnesses or evidence apart from the victim herself and her wounds[, the suspect] had confessed and was in custody[, t]he Sheriff's officers had found the gun used in the crime[, and t]he crime scene was sealed." *Id.* at 1083. The court concluded that the officers were deliberately indifferent because "[i]t was obvious that delaying a bleeding gun shot victim's ambulance increased the risk of death." *Id.*

Similarly here, a reasonable juror could conclude that the County Defendants and Officer Mawson knew that Clark was injured and incapacitated based on the shots fired, the drone footage of Clark reflecting no movement, and the thermal image depicting what appeared to be

PAGE 51 – OPINION AND ORDER

cooling blood outside his body. In addition, officers found Clark's gun at 2:23 a.m. but still no one rendered aid or allowed medical staff to approach Clark. (Rodriguez Decl. at 12:20-21; Deputy Ferguson Tr. at 51:15-25; Robinson Decl. ¶ 8; Castro Decl. ¶ 8.) Drawing all reasonable inferences in favor of Plaintiffs, a reasonable juror could find that all of the County Defendants were aware of the events that unfolded because they received updates on their CCSO radio channel. (*See* Deputy Sanders Decl. at 67:21-25; 68:4, 72:6-7; Deputy Sanders Dep. at 60:24-25; Officer Mawson Dep. at 39:6; Officer Clark Body-Worn Video at 1:32:50-1:33:25 a.m.; Officer Tooze Body-Worn Video at 1:34:15-1:34:25 a.m.)

Viewing these facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, a reasonable juror could conclude that Clark was injured, his injuries were survivable, and at some point he no longer presented an immediate threat to the many law enforcement officers assembled at the scene. Accordingly, a reasonable juror could find that the County Defendants and Officer Mawson "affirmatively increased th[e] danger" to Clark by failing to render aid and preventing others from rendering aid.[13] *Maxwell*, 708 F.3d at 1082.

///

///

---

[13] Officer Mawson argues that "summoning paramedics generally satisfies the constitutional requirement to render aid to an individual injured by police, even if the police do not perform first aid." (Officer Mawson Mot. at 8-9, citing *D'Braunstein v. Cal. Hwy. Patrol*, 131 F.4th 764, 769 (9th Cir. 2025)). However, *D'Braunstein* did not address a state-created danger theory of liability. In *D'Braunstein*, an officer "received a call about a traffic collision[,]" responded to the scene, and transported an individual to jail instead of calling for medical assistance. *Id.* at 767. The individual later suffered a stroke and sued the officer for the delay in medical care. *Id.* The Ninth Circuit held that "officers who promptly request[] an ambulance for an arrestee, but who did not perform [medical aid], acted in an objectively reasonable manner." *Id.* at 769. Unlike here, the officer in that case did not create the danger facing the plaintiff by preventing an ambulance from reaching the injured person. When a law enforcement official creates the danger facing an individual, they owe an "affirmative constitutional duty of protection[.]" *Wood*, 879 F.2d at 586.

PAGE 52 – OPINION AND ORDER

### b.      Foreseeability

The state-created danger exception applies only where "plaintiff's ultimate injury [was] foreseeable to the defendant." *Munger*, 227 F.3d at 1086 (citing *Martinez*, 943 F.3d at 1273). "The potential injury from an untreated gunshot wound is 'objectively foreseeable as a matter of common sense.'" *Est. of F.R.*, 2023 WL 6130049, at *2 (quoting *Murguia*, 61 F.4th at 1115-16). Accordingly, a reasonable juror could conclude that Clark's death from an untreated gunshot wound was objectively foreseeable.

### c.      Deliberate Indifference

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County v. Brown,* 520 U.S. 397, 410 (1997). To show deliberate indifference, Plaintiffs must demonstrate that Defendants "kn[ew] that something was going to happen, but ignored the risk and exposed [Plaintiffs] to it anyway." *Martinez*, 943 F.3d at 1274 (quoting *Hernandez*, 897 F.3d at 1135).

In *Abdelaziz*, the Ninth Circuit found that the plaintiffs "carried their burden" to show deliberate indifference because the officers saw the "'carnage, injuries[,] and death' caused by [a] collision but did not render aid or call for help[.]" *Abdelaziz,* 137 F.4th at 984. Similarly here, there is a genuine dispute of material fact as to whether the County Defendants and Officer Mawson knew that Clark was injured and ignored that risk. *See id.* (holding that the court could "reasonably infer that [d]efendants saw that [p]laintiffs needed immediate medical attention . . . [but] still 'chose to do nothing about it'" (quoting *Bracken v. Okura*, 869 F.3d 771, 780 (9th Cir. 2017))); *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1019 (C.D. Cal. 2019) ("Delays of even a few minutes in seeking care for life-threatening injuries can constitute deliberate indifference.") (citation omitted).

///

PAGE 53 – OPINION AND ORDER

For these reasons, the Court finds that genuine disputes of material fact about the time of Clark's death, the survivability of his injuries, and whether the County Defendants and Mawson were deliberately indifferent to a known or obvious danger preclude entry of summary judgment on Plaintiffs' failure to render aid claims.

### 2.    Trooper Cole

Trooper Cole moves for summary judgment on Plaintiffs' failure to render aid claim on the grounds that he was not deliberately indifferent to a known or obvious danger and Clark's injuries were not survivable. (Trooper Cole's Mot. at 25-27.) Plaintiffs respond that there is a genuine dispute of material fact about whether Trooper Cole violated Clark's clearly established rights because, like the other defendants, he "did not clear the scene for medical personnel to render aid[.]" (Pls.' Resp. Trooper Cole at 12.)

Less than two minutes after he fired shots at Clark, Trooper Cole radioed for medical assistance. (Bercovici Decl. at 9; Trooper Cole Dep. at 96:21-23, 97:7-8; Det. Wadsworth Tr. at 27:1-2; Rodriguez Decl. at 11; Trooper Cole Body-Worn Video at 12:56:08-12:56:15 a.m.) Trooper Cole told dispatch "to have medical staged at the intersection of Harmony and Railroad." (Trooper Cole Dep. at 96:21-23.) In contrast to the County Defendants and Mawson, Plaintiffs offer no evidence that Trooper Cole was aware of the drone footage that showed an individual likely bleeding out in the exact location where Trooper Cole last saw Clark. Although Officer Clark and Officer Tooze broadcast over the CCSO radio that the individual had not moved since the drone began monitoring and the County Defendants circulated a screenshot of Clark's heat signature to the CCSO, Plaintiffs submit no evidence that Trooper Cole (an OSP Trooper) had access to these CCSO communications. (Officer Mawson Body-Worn Video at 1:38:10-1:38:30 a.m., 1:33:57-1:34:19 a.m, Officer Tooze Body-Worn Video at 1:34:15-1:34:25 a.m.)

PAGE 54 – OPINION AND ORDER

In light of the undisputed evidence that Trooper Cole almost immediately sought medical assistance for Clark and in the absence of any evidence that Trooper Cole knew that Clark had been shot or was bleeding and incapacitated, the Court finds that no reasonable juror could conclude that Trooper Cole was deliberately indifferent by failing to render aid to Clark. Accordingly, the Court grants Trooper Cole's motion for summary judgment on Plaintiffs' failure to render aid claim.

## IV.    FAMILIAL DUE PROCESS

Defendants move for summary judgment on Plaintiffs' due process claims. (Cnty. Defs.' Mot. at 53-55; Trooper Cole's Mot. at 29-33.) Plaintiffs also move for summary judgment on the ground that "the Estate, Sarah Miles, and R.L.C. have due process rights to bring loss of society and companionship claims for Derrick's death."[14] (Pls.' Mot. Summ. J. Trooper Cole at 20; Pls.' Mot. Summ. J. Cnty. Defs. at 14.)

### A.    Applicable Law

The Ninth Circuit has recognized "that an individual can assert a 'Fourteenth Amendment claim for loss of companionship and familial association' in a police excessive force case." *Perkins v. Edgar*, No. 21-55552, 2022 WL 14476272, at *2 (9th Cir. Oct. 25, 2022) (quoting

---

[14] It appears that following conferral, Defendants mistakenly believed that Plaintiffs were not proceeding on their familial due process claims with respect to harm caused to Clark's body by the dog bite or the flash bang and stinger balls. The Court notes that Plaintiffs' due process theories of liability in TAC are not clear. (*See* TAC ¶ 178, vaguely alleging that all Defendants "are liable to Plaintiff Sarah Miles, R.L.C., and D.M.M. for violating their Fourteenth Amendment right to society and companionship with Derrick Clark by engaging in conduct that shocks the conscience, conduct that unlawfully caused Mr. Clark's suffering and death"). As a result, the parties did not adequately brief the issue of whether judgment should enter on Plaintiffs' familial due process claims as they relate to the flash bang and stinger balls or the post-mortem dog bite. Accordingly, the Court denies the summary judgment motions with respect to Plaintiffs' familial due process claims relating to the flash bang, stinger balls, and dog bite, and invites the parties to confer regarding a briefing schedule on supplemental motions for summary judgment on those claims.

PAGE 55 – OPINION AND ORDER

*Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022)). For familial association claims, courts must "look to whether the officers' conduct deprived [the plaintiff] of [her] familial interest in a manner that 'shocks the conscience.'" *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) (quoting *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)).

The Ninth Circuit applies one of two standards to determine whether a defendant's conduct "shocks the conscience," depending on the circumstances. *Id.* When the defendants are in a quickly escalating situation that requires a "snap judgment," courts will apply a "purpose-to-harm standard" which requires the plaintiffs to demonstrate that the defendants acted with "a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (citing *Hayes*, 736 F.3d at 1230). When the defendants "have ample time to correct their obviously mistaken [conduct] . . . but nonetheless fail to do so, the [decedent]'s family members need only plead deliberate indifference to state a claim under the due process right to familial association." *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) (citation omitted). In this context, the Ninth Circuit defines "deliberate indifference" as "the conscious or reckless disregard of the consequence of one's acts or omissions." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013)). "It entails something more than negligence but . . . less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

B.     Analysis

1.     The County Defendants

The County Defendants argue that Plaintiffs' loss of familial association claims fail for "lack of evidence of intent to harm or subjective deliberate indifference." (Cnty. Defs.' Mot. at 53.) Plaintiffs respond that "[t]he County is not entitled to summary judgment on Plaintiffs' loss of society and companionship claim because there is evidence from which a jury could conclude

PAGE 56 – OPINION AND ORDER

that [Deputy] Ferguson acted with malice and Defendants recognized but ignored an unreasonable risk that [Clark] was dying." (Pls.' Resp. at 24.) Plaintiffs also argue that "[a] reasonable jury could conclude Defendants actually knew of the risk that [Clark] had been shot and was bleeding out." (*Id.* at 25.)

### a.    Use of Force

Plaintiffs bring a loss of familial association claim against Deputy Ferguson for having "the subjective purpose to harm Derrick apart from legitimate law enforcement objectives." (*Id.* at 24.) To evaluate this claim, the Court must first determine whether to apply the purpose to harm or deliberate indifference standard.

In *Porter*, the Ninth Circuit considered a loss of society and familial association due process claim brought by the surviving parents of a motorist who was shot by an officer during an investigation of a suspicious vehicle. *See Porter*, 546 F.3d at 1137. The Ninth Circuit reasoned that "the urgent public safety threat of fleeing motorists in a situation where inaction could be the most dangerous option" warranted use of the purpose to harm standard because actual deliberation is not practical. *Id.* The court cited the Supreme Court's decision in *Lewis*, where the court reasoned that "[j]ust as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998)). Accordingly, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under [Section] 1983." *Lewis*, 523 U.S. at 854. The Ninth Circuit has refused "to try to draw a distinction between 'emergency' and 'non-emergency' situations involving high-speed chases aimed at apprehending a fleeing suspect." *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir.

PAGE 57 – OPINION AND ORDER

2008). Accordingly, the Court applies the purpose to harm standard for Plaintiffs' loss of familial association claim against Deputy Ferguson.

The County Defendants argue that Plaintiffs cannot meet this standard because they "cannot point to any evidence from which a reasonable jury could conclude that Deputy Ferguson's use of force meets this high legal bar." (Cnty. Defs.' Mot. at 54.) Plaintiffs respond that "a reasonable jury could conclude that Ferguson acted with the required purpose to harm [Clark]" because Deputy Ferguson chased Clark in the dark and during a torrential downpour, continued pursuing Clark after Sergeant Heimbuck told him to terminate the pursuit, hit Clark's car twice, and shot at Clark as he fled, and was laughing and texting after the incident. (Pls.' Resp. at 25.)

In *Ochoa*, the Ninth Circuit granted the defendants' motion for summary judgment in a deadly force case. *See Ochoa*, 26 F.4th at 1055. The plaintiffs alleged that because the "officers continued to shoot [the decedent] when he was on the ground and that when the officers directed the police dog to drag [the decedent] so they could see his hands, the officers laughed and cheered[,]" the officers had an improper purpose to harm. *Id.* at 1058. The Ninth Circuit disagreed, concluding that these actions "do not show that the officers acted with an improper purpose to harm" because "they were concerned that [the suspect] still had access to [deadly weapons]." *Id.* This "reflects a legitimate law enforcement objective: the safety of the officers and others." *Id.* Finally, "[a]s to the contested . . . assertion about the cheering and laughing, it ha[d] minimal relevance because it relate[d] to events that took place after the officers fired at [the suspect]." *Id.*

Similarly here, it is undisputed that the events unfolded quickly and Deputy Ferguson heard Trooper Cole yell "gun gun gun" and then heard shots fired. (Ferguson Decl. ¶ 12; Trooper

PAGE 58 – OPINION AND ORDER

Cole Dep. at 13:1-3, Det. Wadsworth Tr. at 27:10-12, 27:20-22, 28:7-8; Rodriguez Decl. at 10; Bercovici Decl. at 8.) Under these circumstances, Plaintiffs cannot meet the high "purpose to cause harm" standard because Deputy Ferguson's decision to shoot "reflect[ed] a legitimate law enforcement objective: the safety of the officers and others." *Ochoa*, 26 F.4th at 1055;[15] *see also Lewis v. Nanos*, 766 F. Supp. 3d 905, 935-36 (D. Ariz. 2024) ("[The defendant] made a split-second judgment that the object in [the decedent]'s hand was a handgun and shot [the decedent] to protect himself. Self-protection is a legitimate law enforcement objective. As discussed above, there are genuine disputes concerning the reasonableness of [the defendant]'s conclusion that [the decedent] posed an immediate threat of harm. However, [the plaintiffs] point to no competent evidence in the record that [the defendant] had any ulterior motive for shooting [the decedent]. On this record, Plaintiffs have not shown that [the defendant]'s conduct 'shocks the conscience.' The Court will therefore grant Defendants' Motion for Summary Judgment as to Plaintiffs' substantive due process claim."), *aff'd*, No. 25-1025, 2026 WL 295738 (9th Cir. Feb. 4, 2026); *Vasquez v. City of San Jose*, 634 F. Supp. 3d 712, 732 (N.D. Cal. 2022) (entering summary judgment on the plaintiff's due process claim in similar deadly force case because "Plaintiffs d[id] not offer sufficient evidence to support the argument that the Officers acted with a purpose to harm [the decedent] unrelated to legitimate law enforcement objectives" and "no reasonable jury could come to such a conclusion"), *aff'd*, No. 22-16691, 2024 WL 445320 (9th Cir. Feb. 6, 2024).

///

///

---

[15] Additionally, as in *Ochoa*, Deputy Ferguson's alleged laughing and texting occurred after the incident. (*See* Pls.' Mot. Sanctions Spoliation Evid. at 3:14, ECF No. 140.)

Accordingly, the Court concludes that no reasonable juror could find that Deputy Ferguson's actions "shock the conscience" and grants the County Defendants' motion for summary judgment on this claim.

### b.    Failure to Render Aid

The County Defendants also move for summary judgment on Plaintiffs' familial due process claim for failure to render aid. (Cnty. Defs.' Mot. at 55-56.) Plaintiffs respond that "[a] reasonable jury could conclude Defendants actually knew of the risk that [Clark] had been shot and was bleeding out." (Pls.' Resp. Cnty. Defs.' at 25.)

Unlike Deputy Ferguson's decision to pursue and shoot Clark, the County Defendants' decision not to render medical aid to Clark was not "a split-second decision" like "a high-speed car chase or when confronting a threatening, armed suspect." *Peck*, 51 F.4th at 893. The County Defendants' confrontation with Clark spanned a few hours. The County Defendants made several deliberate decisions such as launching a drone, moving toward Clark in an armored vehicle, and deploying flash ball and stinger grenades, indicating that "actual deliberation [wa]s practical." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (quoting *Lewis*, 523 U.S. at 851). Accordingly, the Court applies the less stringent deliberate indifference standard. *See Hayes*, 736 F.3d at 1230 (holding that "[w]here actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience").

The Court has already concluded that genuine disputes of material fact exist regarding whether the County Defendants were deliberately indifferent to Clark's medical needs. Accordingly, the Court denies the County Defendants' motion for summary judgment on this familial due process claim.

///

///

PAGE 60 – OPINION AND ORDER

### 2.     Trooper Cole

Trooper Cole also moves for summary judgment on Plaintiffs' familial due process claims on the ground that his use of force and failure to render medical aid do not shock the conscience. (Trooper Cole's Mot. at 30.) Plaintiffs counter-move for summary judgment. (Pls.' Mot. Summ. J. Trooper Cole at 14.)

#### a.     Use of Force

Trooper Cole argues that under the purpose to harm standard, "[t]here is no evidence that Trooper Cole had a purpose to harm Clark apart from legitimate law enforcement objectives." (Trooper Cole's Mot. at 30.) Plaintiffs respond that "[t]here were no facts, and Trooper Cole has articulated none, that established or even suggested that joining Ferguson's pursuit was necessary to maintain his safety." (Pls.' Resp. Trooper Cole at 14.) For the same reasons discussed above with respect to Deputy Ferguson, the Court grants Trooper Cole's motion for summary judgment, and denies Plaintiffs' motion for summary judgment, on this claim.

#### b.     Failure to Render Aid

Trooper Cole also moves for summary judgment on Plaintiffs' loss of familial association claim for failure to render aid. (Trooper Cole's Mot. at 31.) The Court concluded above that Trooper Cole is entitled to summary judgment on Plaintiffs' failure to render aid claim. Absent an underlying constitutional violation, the Court grants Trooper Cole's motion for summary judgment, and denies Plaintiffs' cross-motion for summary judgment, on Plaintiffs' familial due process claim.

### 3.     Officer Mawson

In the Court's analysis of Plaintiffs' failure to render medical aid claim against Mawson, the Court concluded that there is a genuine dispute of material fact regarding whether Mawson

was deliberately indifferent to Clark's medical needs. Accordingly, the Court denies Mawson's incorporation of the County Defendants' motion for summary judgment on this claim.

### 4. D.M.M.

The County Defendants, Trooper Cole, and Officer Mawson assert an affirmative defense that certain Plaintiffs lack the right to bring a due process claim for loss of familial association. (*See* Cnty. Defs.' Ans. at 12; Trooper Cole's Ans. at 9; Officer Mawson's Mot. at 7.) Plaintiffs move for summary judgment on the ground that "[t]he Estate, Sarah Miles, and R.L.C. have due process rights to bring loss of society and companionship claims for [Clark's] death." (Pls.' Mot. Summ. J. Cnty. Defs. at 14.) The Court agrees and enters summary judgment on that issue. *See Lemire v. Cal. Dept. of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).("Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct.").

However, Plaintiffs conceded during conferral that Clark's sibling, D.M.M., may not assert a due process claim with respect to a deceased sibling. *See Ward v. City of San Jose*, 967 F.2d 280, 283-284 (9th Cir. 1991) (holding that "[n]either the legislative history nor Supreme Court precedent supports an interest for siblings consonant with that recognized for parents and children"). Accordingly, the Court denies Plaintiffs' motion for summary judgment with respect to D.M.M.'s right to bring a due process claim.

## V. EQUAL PROTECTION

The SWAT Defendants and Officer Mawson move for summary judgment on Plaintiffs' equal protection claim. (Cnty. Defs.' Mot. at 62-66; Officer Mawson Mot. at 4-6.) The SWAT Defendants argue that there is no evidence in the record that they "intentionally discriminated against Clark based on his race." (Cnty. Defs.' Mot. at 62.) Mawson similarly argues that there is

PAGE 62 – OPINION AND ORDER

no evidence that he intentionally discriminated against Clark based on his race. (Officer Mawson Mot. at 4-6.)

### A.    Applicable Law

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Boardman v. Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020) (simplified). "To state a claim under . . . [Section] 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment[,] a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Shooter v. Arizona*, 4 F.4th 955, 960 (9th Cir. 2021) (quoting *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013)). "Merely being present while another is violating the Equal Protection Clause is not enough." *Porter v. County of Solano*, No. 2:21-cv-01473-KJM-JDP, 2025 WL 621545, at *25 (E.D. Cal. Feb. 26, 2025).

### B.    Analysis

#### 1.    Officer Mawson

Officer Mawson argues that his only involvement in this case was driving "an armored car through a parking lot and ma[king] some flippant remarks that do not amount to a constitutional violation." (Officer Mawson's Mot. at 4.) Officer Mawson also notes that he "did not use any force on Clark, . . . was not present at the scene of the traffic stop and the shooting[,] . . . did not deploy any flashbangs or other less then lethal tools at Mr. Clark[, and] . . . did not deploy the K-9 into the bushes to bite Clark." (*Id.*)

The Court finds that a reasonable juror could conclude that Officer Mawson violated Clark's equal protection rights. While approaching Clark in the armored vehicle, Officer Mawson compared Clark to "a warm, dead deer." (Officer Mawson Body-Worn Video at

PAGE 63 – OPINION AND ORDER

2:35:30-40 a.m.) Shortly thereafter, Officer Mawson announced: "[t]his ole boy is dead . . . [and] no longer with us." (*Id.* at 2:45:10-2:45:20 a.m.) Officer Mawson also told another SWAT Defendant that "[w]e're just going to do some janky shit." (*Id.* at 2:44:40-2:44:45 a.m.) Officer Mawson does not deny that he made these derogatory comments and describes them as "flippant remarks that do not amount to a constitutional violation." (Officer Mawson Decl. at 4.)

"Generally, racially derogatory statements, without more, do not rise to the level of an established constitutional violation under the Fourteenth Amendment." *Hernandez v. County of Marin*, Case No. 11-cv-03085, 2013 WL 6055224, at *9 (N.D. Cal. Nov. 14, 2013) (citing *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)). However, "[t]he Ninth Circuit has held that a single statement, such as 'dumb Mexican', is direct evidence of discriminatory animus and can create an inference of discriminatory intent." *Monetti v. City of Seattle*, 875 F. Supp. 2d 1221, 1230 (W.D. Wash. 2012) (first citing *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997); and then citing *Sischo-Nownejad v. Merced Cmty. Coll. Dist.,* 934 F.2d 1104, 1112 (9th Cir. 1991)).

Although racially offensive statements standing alone are not constitutional violations, as discussed herein there is a genuine dispute of material fact regarding whether Officer Mawson violated Clark's constitutional rights by failing to render aid or conspiring to use excessive force. *See Hernandez*, 2013 WL 6055224, at *9 ("[The] evidence shows that [the law enforcement officer] uttered racially derogatory statements in the course of [the plaintiffs'] arrests, which raises the inference of a discriminatory motive, and that [the law enforcement officer] then purportedly proceeded to use excessive force against [the plaintiffs]." (first citing *Monetti*, 875 F. Supp. 2d at 1230; and then citing *Cordova*, 124 F.3d at 1149)). A genuine dispute of material fact also exists with respect to whether Officer Mawson violated Clark's constitutional rights

PAGE 64 – OPINION AND ORDER

based on racial animus. *See King v. City of Eastpointe*, 86 F. App'x 790, 803 (6th Cir. 2003) ("The word 'boy' as used by [the officer] in this context could definitely be interpreted as racially derogatory . . . . Although the question is close, the evidence of the use of a possibly racial epithet raises an issue of fact as to whether [the officer]'s actions toward [the plaintiffs] following the stop were based on race.").

Accordingly, the Court denies Officer Mawson's motion for summary judgment on Plaintiffs' equal protection claim.

### 2.    The SWAT Defendants

The SWAT Defendants also move for summary judgment on Plaintiffs' equal protection claim, arguing that "Plaintiffs . . . cannot produce evidence of specific, subjective intent to discriminate by individual SWAT Defendants." (Cnty. Defs.' Mot. at 63.) Plaintiffs respond that while Officer Mawson made comments referring to Clark as "a warm, dead deer" and an "ole boy[,]" "[a] reasonable juror could infer that the SWAT Defendants heard Mawson's comments and, because they failed to intervene and themselves made flippant comments . . . they acted with discriminatory intent." (Pls.' Resp. Cnty. Defs. at 29.)

In *Monetti*, an officer heard another officer's racially derogatory comment, "failed to show any disapproval, and moments later stomped on the plaintiff's right calf[.]" *Monetti*, 875 F. Supp. 2d at 1230. The plaintiff argued that "this [wa]s evidence of discriminatory motive[.]" *Id.* The court held that "[t]he plaintiff fail[ed] to cite authority for th[is] proposition" and dismissed the plaintiff's equal protection claim. *Id.* ("The plaintiff fails to cite authority for the proposition that a failure to chastise a fellow officer for derogatory remarks, or using physical force against a suspect after hearing a racially charged comment, is sufficient evidence to show discriminatory intent as to [a law enforcement officer]. Therefore, [the] plaintiff's equal protection claim against [the law enforcement officer] fails and shall be dismissed.").

PAGE 65 – OPINION AND ORDER

Similarly here, Plaintiffs argue that the SWAT Defendants acted with discriminatory intent "because they failed to intervene" when Officer Mawson made derogatory comments. (Pls.' Resp. Cnty. Defs. at 29.) Plaintiffs cite no authority to suggest that a failure to call out another law enforcement officer for racially offensive comments can serve as the basis for an equal protection claim.

The Court further finds the SWAT Defendants' own comments during the incident do not reflect discriminatory intent. For example, Officer Reynolds announced over the megaphone that Clark should surrender and warned that force would be used. (Officer Mawson Body-Worn Video at 2:26:25-2:28:00 a.m.) An unidentified SWAT team member said "[a] bang and a stinger ball would be fuckin' sick." (Casey Newton body-Worn Video at 2:25:55-2:26:20 a.m.; Nate Ariel Body-Worn Video at 2:27:50-2:28:00 a.m., ECF No. 124.) Deputy Sanders made "jokes about a mustache, using the phrase 'YOLO,' singing a line from a Black Eyed Peas song entitled 'Bring the Action,' suggesting [that] we might 'drop a bang' on him and 'toss a bang right in his lap.'" (Sanders Decl. ¶ 21.) Deputy Reynolds announced that Clark is "going to have [a] dog bite." (Reynolds Decl. ¶ 8.) The Court finds that no reasonable juror could conclude that these comments—although strikingly unprofessional—reflect racial animus.

Plaintiffs argue that "[d]irect evidence of intentional discrimination, such as clearly racist statements, 'will only rarely be available'" and therefore genuine disputes of material fact exist with respect to whether the SWAT Defendants acted with discriminatory intent. (Pls.' Mot. Summ. J. Cnty. Defs. at 27, citing *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999).) However, the Ninth Circuit in *Mendocino Env't Ctr.* required that in the absence of direct evidence, agreements must still be inferred from "circumstantial evidence or the existence of joint action." *Mendocino Env't Ctr.*, 192 F.3d at 1302. Plaintiffs have presented

PAGE 66 – OPINION AND ORDER

no circumstantial evidence or evidence of joint action so that a reasonable juror could conclude that any individual defendant other than Officer Mawson acted with an intent or purpose to discriminate against Clark based on his race. Accordingly, the Court grants the SWAT Defendants' motion for summary judgment on Plaintiffs' equal protection claim.

## VI.    CONSPIRACY

Plaintiffs allege that the SWAT Defendants "arriving after 2:15 am . . . engaged in [Section 1983 and 1985] conspirac[ies] to deprive [] Clark of his rights under the Fourth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process clause of the Fourteenth Amendment" by "making racist and biased comments, and continuing to use force against him as he laid motionless throwing explosives at him and having a dog bite him." (TAC ¶¶ 182-88.)

### A.    Applicable Law

"Although both [Section] 1983 and [Section] 1985 are civil rights statutes, they have different origins." *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980). "Section 1983 is based upon the fourteenth amendment and thus concerns deprivations of rights that are accomplished under the color of state law." *Id.* (citations omitted). "Section 1985, on the other hand, is derived from the thirteenth amendment and covers all deprivations of equal protection of the laws . . . regardless of its source." *Id.* (citations omitted).

"To prove conspiracy between [defendants] under [Section] 1983, an agreement or meeting of minds to violate the [plaintiff's] constitutional rights must be shown." *Woodrum v. Woodward Cnty., Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989) (citing *Fonda v. Gray,* 707 F.2d 435, 437 (9th Cir. 1983)). The plaintiff "must show (1) an agreement between the defendants to deprive the plaintiff of a constitutional right, (2) an overt act in furtherance of the conspiracy, and (3) a constitutional deprivation." *Davis v. Powell*, 901 F. Supp. 2d 1196, 1217 (S.D. Cal.

PAGE 67 – OPINION AND ORDER

2012); *Humphery v. City of San Diego*, No. 25-cv-00813-DMS-KSC, 2025 WL 2231244, at *7 (S.D. Cal. Aug. 5, 2025). "Conspiracy is not itself a constitutional tort under [Section] 1983." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). Nevertheless, "[c]onspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the [Section 1983] violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired." *Id.*

"[T]o make out a violation of § 1985(3) . . . the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).

With respect to the first element, "[a] mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). Rather, plaintiffs "must allege facts to support the allegation that defendants conspired together." *Id.* The Ninth Circuit described the pleading requirements for constitutional conspiracies as follows:

> Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants. For example, a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement may allow a jury to infer the existence of a conspiracy. Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached a[n] understanding to achieve the conspiracy's objectives. To be liable, each

PAGE 68 – OPINION AND ORDER

participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.

*Mendocino Env't Ctr.*, 192 F.3d at 1301-02 (simplified).

With respect to the second element, Plaintiffs must demonstrate a genuine dispute of material fact that two more or persons "shared a goal" of violating, or reached an agreement to violate, Clark's constitutional rights. *O'Handley v. Weber*, 62 F.4th 1145, 1162-63 (9th Cir. 2023) (affirming dismissal of conspiracy claims against the California Secretary of State under Rule 12(b)(6), noting "there is no unconstitutional conspiracy without this shared specific intent," and explaining that the plaintiff's claim was "fatal[ly] flaw[ed]" because he did not allege that the California Secretary of State and a private entity "shared a goal of violating his or anyone else's constitutional rights"), *cert. denied*, 144 S. Ct. 2715 (2024); *see also Ogunsalu v. Sweetwater Union High Sch. Dist.*, 745 F. App'x 757, 758 (9th Cir. 2018) (affirming dismissal of a conspiracy claim and noting that a conspiracy under Section 1985 requires that the defendants reach an agreement with one another).

"[A] required element of a [Section] 1985 claim is that the plaintiff be a member of a protected class and the deprivation of civil rights have been motivated by animus toward that class." *Sanford v. Klamath County*, No. 1:24-cv-00942-AA, 2024 WL 4664485, at *3 (D. Or. Nov. 4, 2024) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). "Ninth Circuit precedent requires at a minimum that the [plaintiffs] plead with particularity which defendants conspired, how they conspired and how the conspiracy led to a deprivation of [the plaintiff's] constitutional rights." *Dauven v. U.S. Bancorp*, No 3:13-cv-00844-AC, 2015 WL 2239407, at *7 (D. Or. May 12, 2015), *aff'd*, 698 F. App'x 436 (9th Cir. 2017).

///

///

PAGE 69 – OPINION AND ORDER

### B.    Analysis

#### 1.    Excessive Force

The SWAT Defendants and Officer Mawson move for summary judgment on the ground that "Plaintiffs have not and cannot point to evidence indicating there was any meeting of the minds between the individually named SWAT defendants for the purpose of discriminating against [] Clark and violating his constitutional rights." (Cnty. Defs.' Mot. at 67; Officer Mawson Mot. at 7-8.) The SWAT Defendants also argue that Plaintiffs fail to "identify any material evidence demonstrating the scope of the conspiracy, each individual defendant's role in the conspiracy, or how the conspiracy operated." (*Id.*) Plaintiffs respond that it is unnecessary to identify the scope of the conspiracy, and that "evidence that the SWAT Defendants committed acts they undertook with express and implied agreement are sufficient to create a genuine issue of material fact as to the existence of a conspiracy." (Pls.' Resp. at 30-32.)

Plaintiffs present evidence of an alleged conspiracy to use excessive force (i.e., the flash bang and stinger balls) only with respect to Deputy Sanders and Officers Robinson, Mawson, and Reynolds. Specifically, Officer Mawson told another SWAT Defendant that "[w]e're just going to do some janky shit." (Officer Mawson Body-Worn Video at 2:44:40-2:44:45 a.m.) Officer Reynolds laughed at Officer Mawson's comments and suggested that "we just give him the rotary." (*Id.* at 2:49:10-2:49:23 a.m.) Deputy Sanders testified that Officer Robinson asked him to deploy the flash bang and stinger ball, which he did. (Deputy Sanders Dep. at 66:23-67:11.) Deputy Sanders also acknowledges that he was the one who suggested "we might 'drop a bang' on him and 'toss a bang right in his lap.'" (Sanders Decl. ¶ 21.) Plaintiffs present no evidence that any other individual defendant conspired to use excessive force by deploying or encouraging the deployment of the flash bang or stinger balls on Clark.

///

PAGE 70 – OPINION AND ORDER

Defendants argue that the intracorporate conspiracy doctrine bars a conspiracy claim against individuals of the same organization. (*See* Cnty. Defs.' Mot. at 68; Officer Mawson Mot. at 6-7.) Even if the intracorporate conspiracy doctrine applied here, Officer Mawson is employed by the Oregon City Police Department (*see* Officer Mawson Mot. Ex. 1 at 8), not CCSO, and Defendants have not identified any authority supporting that the intracorporate conspiracy doctrine applies to individual law enforcement officers from different agencies that work together on a team or task force. *See Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017) ("Under . . . the intracorporate-conspiracy doctrine[,] an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy."); *McCrae v. Town of Brookhaven*, 759 F. Supp. 3d 372, 397 (E.D.N.Y. 2024) ("[T]he intra-corporate conspiracy doctrine does not bar claims which allege a conspiracy between individuals in different agencies.); *Zelaya v. Hammer*, 516 F. Supp. 3d 778, 805 (E.D. Tenn. 2021) (citing *Ziglar* for the proposition that "the intracorporate-conspiracy doctrine plainly applies only to individuals within the same legal entity" and concluding that "[n]o reasonable officer could believe that Tennessee Highway Patrol officers—who are employed by a Tennessee state agency—are part of the same legal entity as federal IRS and DHS officers"); *Clayton v. Farrell*, No. CV 12-7210 GAF, 2013 WL 12129383, at *1 (C.D. Cal. Nov. 15, 2013) (denying the applicability of the intracorporate conspiracy doctrine to a Section 1985(3) claim involving a joint task force between the Los Angeles County Sheriff's Department and the United States Drug Enforcement Agency).

For these reasons, the Court finds that a reasonable juror could conclude that Deputy Sanders and Officers Robinson, Mawson, and Reynolds (and perhaps an unidentified co-conspirator) conspired to use unconstitutional excessive force on Clark, but no reasonable juror

PAGE 71 – OPINION AND ORDER

could so conclude with respect to the other individual defendants. Accordingly, the Court denies Defendants' motions for summary judgment on Plaintiffs' Section 1983 conspiracy to use excessive force claim with respect to Deputy Sanders, Officer Robinson, Officer Reynolds, and Officer Mawson but grants the motion with respect to the other individual defendants.

### 2.    Racial Discrimination

The SWAT Defendants and Officer Mawson also move for summary judgment on Plaintiffs' claim that they conspired to deprive Clark of his equal protection rights in violation of Sections 1983 and 1985(3). The Court concluded above that no reasonable juror could conclude that any of the SWAT Defendants intentionally discriminated against Clark based on his race and only Plaintiffs' equal protection claim against Officer Mawson survives summary judgment. There can be no conspiracy of one, and therefore the Court grants Defendants' motions for summary judgment on Plaintiffs' Section 1983 and 1985(3) conspiracy claims based on alleged racial animus. *See Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1171 (9th Cir. 2021) (holding that "[w]hile [Section] 1983 provides a cause of action if one person deprives an individual of his constitutional rights, [Section] 1985(3) provides a cause of action if two or more persons conspire to deprive an individual of his constitutional rights"); *Salka v. City of Los Angeles*, 48 F.3d 1228 (9th Cir. 1995) (holding that "conclusory allegations of a conspiracy were insufficient to withstand defendants' motion for summary judgment"); *Comm. for Immigrant Rts. of Sonoma Cnty. v. County of Sonoma*, 644 F. Supp. 2d 1177, 1203 (N.D. Cal. 2009) (holding that a "conspiracy claim brought under [Section] 1983 requires proof of 'an agreement or meeting of the minds to violate constitutional rights'" (quoting *Franklin v. Fox,* 312 F.3d 423, 441 (9th Cir. 2002))).

///

///

PAGE 72 – OPINION AND ORDER

## VII.   QUALIFIED IMMUNITY

Defendants move for summary judgment on all of Plaintiffs' federal claims on qualified immunity grounds. (*See* Cnty. Defs.' Mot. at 25-26, 29, 47, 52-53; Officer Mawson Mot. at 9.) Plaintiffs also move for summary judgment on Defendants' qualified immunity affirmative defenses. (Pls.' Mot. Summ. J. Cnty. Defs. at 20, 25-26; Pls.' Mot. Summ. J. Officer Mawson at 15-16.) In light of the disputes of material fact identified above, the Court denies Defendants' and Plaintiffs' motions with respect to qualified immunity.[16]

### A.   Applicable Law

"Qualified immunity shields government officials from civil liability if 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Wright v. Beck*, 981 F.3d 719, 726 (9th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The defense "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)); *see also Sandoval v. County of San Diego*, 985 F.3d 657, 671 (9th Cir. 2021) ("Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009))).

"The reasonableness of the officer's conduct is 'judged against the backdrop of the law at the time of the conduct.'" *Wright*, 981 F.3d at 726 (quoting *Kisela*, 584 U.S. at 104); *see also Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (asking "whether the applicable law was 'clearly established at the time of the incident'" (quoting *Pearson*, 555 U.S. at 231)). "Officials

---

[16] The Court does not reach the issue of qualified immunity on the federal claims for which it has entered summary judgment on the merits herein.

PAGE 73 – OPINION AND ORDER

are subject to suit only for actions that they knew or should have known violated the law." *Wilk*, 956 F.3d at 1148 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The Supreme Court has explained that the "[l]aw is 'clearly established' for the purposes of qualified immunity if 'every reasonable official would have understood that what he is doing violates the right' at issue." *Id.* (simplified) (quoting *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam)).

In evaluating "qualified immunity in the context of summary judgment, [courts] consider (1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a violation of a constitutional right and (2) whether that right was 'clearly established at the time of the violation.'" *Sandoval*, 985 F.3d at 671 (quoting *Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019)). Defendants are "not entitled to qualified immunity simply because 'the very action in question has [not] previously been held unlawful.'" *Sandoval*, 985 F.3d at 680 (quoting *Hope*, 536 U.S. at 739). "State officials can still be on notice that their conduct violates established law even in novel factual circumstances-i.e., even without a prior case that had fundamentally similar or materially similar facts." *Id.* (simplified) (quoting *Wilk*, 956 F.3d at 1147).

**B.      Analysis**

Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor with respect to Plaintiffs' surviving constitutional claims, a reasonable jury could conclude that Defendants violated Clark's constitutional rights.

Specifically, accepting Plaintiffs' versions of events, a reasonable jury could conclude that: Deputy Ferguson and Trooper Cole used excessive force against Clark by shooting him in the back as he was running away, because he did not present an imminent threat; Deputy Sanders used excessive force against Clark by deploying explosives that landed on or near his body, because he was incapacitated and no longer posed any risk of danger; Officer Mawson and the

PAGE 74 – OPINION AND ORDER

County Defendants were deliberately indifferent by not rendering medical aid to Clark, because he was incapacitated and no longer posed any risk of danger; Deputy Sanders and Officers Robinson, Mawson, and Reynolds conspired to use excessive force against Clark when he no longer posed any risk of danger; and Officer Mawson's constitutional violations were based on racial animus. In light of the genuine disputes of material fact identified above, the Court cannot conclude as a matter of law at the summary judgment stage whether Defendants violated Plaintiffs' constitutional rights. *See Gelhaus*, 871 F.3d at 1006, 1018 (affirming denial of summary judgment on qualified immunity grounds in a deadly force case where the decedent appeared to be carrying a firearm based on relevant inquiry of "whether the defendants would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor" (quoting *George*, 736 F.3d at 836)).

Whether Defendants' conduct violated clearly established law also depends on the resolution of these disputed factual issues. For each of the surviving federal claims, the applicable law was clearly established *if* the jury accepts Plaintiffs' version of events but likely not if the jury accepts Defendants' version of events. For example, if the jury finds that Clark did not point his gun at Deputy Sanders or Trooper Cole and otherwise presented no imminent threat, then Clark's right to be free of excessive force in that context was clearly established. *See Gelhaus*, 871 F.3d at 1021 ("[I]f plaintiffs' version of the facts prevails and the jury concludes that [the decedent] posed no imminent threat to the officers, then [the decedent]'s right to be free of excessive force in this context was clearly established at the time of [the defendant]'s conduct." (first citing *George*, 736 F.3d at 838; then citing *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997); and then citing *Curnow*, 952 F.2d at 325)); *see also Banks v. Mortimer*, 620 F. Supp. 3d 902, 929 (N.D. Cal. 2022) (denying the defendant's motion for summary

PAGE 75 – OPINION AND ORDER

judgment on qualified immunity grounds where "the key facts [were] thoroughly contested" and the parties disputed whether deadly force was justified in the context of a fleeing suspect).

Relatedly, if the jury finds that Defendants should have known Clark was unconscious and near death but they continued firing explosives that detonated near or on top of him, Clark's right to be free of excessive force in that context was also clearly established. *Cf. Nelson*, 685 F.3d at 886 (holding that "the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals . . . constitute[d] unreasonable force in violation of the Fourth Amendment").

Similarly, if the jury concludes that Defendants placed Clark in danger but then failed to render or allow medical aid even when he was unconscious and no longer posed a threat, it was clearly established that failing to provide medical aid in that context violated the Due Process Clause. *See Abdelaziz*, 137 F.4th at 985-86 (denying qualified immunity for officers who failed to render medical aid and citing clearly established law "that officers violate substantive due process when they affirmatively place an individual in danger and then, with deliberate indifference, do nothing to address that danger . . . even if the officer's earlier danger-creating conduct served legitimate law enforcement objectives" (first citing *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989); and then citing *Bracken*, 869 F.3d at 778-79)); *see also id.* (finding that it was clearly established that "'[i]mpeding access to medical care' both (1) 'amounts to leaving a victim in a more dangerous situation' and (2) constitutes deliberately indifferent conduct when it is 'obvious' that delaying a seriously wounded individual's access to treatment will 'increase[ ] the risk of death'" (quoting *Maxwell*, 708 F.3d at 1082-83));[17] *see also Martinez*, 943 F.3d at

---

[17] The Ninth Circuit further held in *Abdelaziz* that it was clearly established that officers violate a person's substantive due process rights where they make "it impossible for anyone to

PAGE 76 – OPINION AND ORDER

1274 (holding that the defendants were not entitled to summary judgment on qualified immunity grounds where "a reasonable jury could find that [the defendants] violated [the plaintiff's] due process right to liberty by affirmatively increasing the known and obvious danger [the plaintiff] faced"); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1067 (9th Cir. 2006) (holding that the defendants were not entitled to summary judgment on qualified immunity grounds where a police officer "unreasonably violated [the plaintiff's] clearly established constitutional right . . . by creat[ing] . . . a known or obvious danger to [the plaintiff] that he . . . would otherwise not face").

In addition, if the jury concludes that Mawson failed to render care or conspired to use excessive force based on racial animus, it was clearly established that law enforcement officers may not treat individuals disparately based on their race. *See, e.g.*, *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010) ("It hardly passes the straight-face test to argue at this point in our history that police could reasonably believe they could treat individuals disparately based on their race."); *Monetti*, 875 F. Supp. 2d at 1230 (holding that "[a] case with materially similar facts is unnecessary to show a right is clearly established, and is 'especially true in equal protection cases because the non-discrimination principle is so clear'" *Id.* (*citing Elliot-Park*, 592 F.3d at 1008); *Hernandez*, 2013 WL 6055224, at *9 (holding that the defendant was "not entitled to qualified immunity with respect to any discrimination claims arising out of the racially derogatory comments he made").

///

///

---

provide emergency medical care to [the decedent]." *Abdelaziz*, 137 F.4th at 985-86 (citing *Penilla*, 115 F.3d at 710)).

PAGE 77 – OPINION AND ORDER

Although Defendants have raised persuasive arguments about the absence of clearly established law according to their version of events, the Court must evaluate the record in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor. As a result, the Court denies both Defendants' and Plaintiffs' motions for summary judgment on the issue of qualified immunity. *See Gelhaus*, 871 F.3d at 1018 ("[S]ummary judgment in favor of moving defendants [wa]s inappropriate [because] a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." (quoting *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997))).

## VIII.  NEGLIGENCE

Plaintiffs allege that Deputy Ferguson's "decision to pursue" Clark "was negligent or careless." (TAC ¶ 169.) Plaintiffs claim that Deputy Ferguson failed "to exercise the level of care that a reasonable person would under similar circumstances" and that his decision "violated established policy." (*Id.*) Plaintiffs allege that Clackamas County is vicariously liable for Deputy Ferguson's negligence. (*Id.*)

Defendants move for summary judgment on the grounds that "Plaintiffs' negligence claim fails due to lack of foreseeability, unreasonable conduct, and causation." (Cnty. Defs.' Mot. Summ. J. at 57.) Defendants also argue that "[b]ecause the cause of Mr. Clark's injury is an intentional act[,]" Plaintiffs have failed to allege a "viable negligence claim[.]" (*Id.* at 61-62.) Defendants assert a comparative fault affirmative defense on Plaintiffs' negligence claim. (Cnty. Defs.' Answer Aff. Defs. Pl.'s TAC ("Cnty. Defs.' Answer") ¶ 29, ECF No. 118.) Plaintiffs move for summary judgment on comparative fault, arguing that Defendants have "pled no facts" to support this affirmative defense. (Pls.' Mot. Summ. J. Cnty. Defs. at 31.)

///

///

PAGE 78 – OPINION AND ORDER

A.      Applicable Law

"Ordinarily, a claim for liability based on negligence merely requires the plaintiff to plead and prove facts to permit a finding that the defendant's 'conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff.'" *Stone v. Witt*, -P.3d-, 374 Or. 524, 530 (Or. 2025) (first citing *Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326, 1336 (Or. 1987); and then citing *Sloan v. Providence Health Sys.-Or.*, 437 P.3d 1097, 1102 (Or. 2019)); *see also Sloan*, 437 P.3d at 1102 ("[W]hen asserting an ordinary negligence claim, a plaintiff must establish that the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff.").

"Although reasonableness is generally a question of fact to be determined by a jury, where there is no doubt that a defendant's conduct was reasonable, the court may resolve the question without submitting it to a trier of fact." *Clement v. Ecolab, Inc.*, 341 F. Supp. 3d 1205, 1215 (D. Or. 2018) (citing *Thurman v. Thomas*, 688 P.2d 125, 127 (Or. Ct. App. 1984)); *see also Fazzolari*, 734 P.2d at 1333 ("As far as 'negligence' rests on a standard of reasonable conduct, the issue ordinarily can be left to the jury, although at the outer margins of debatable conduct a court is obliged to say 'that the conduct does or does not meet the standard.'" (*quoting Stewart v. Jefferson Plywood Co.*, 469 P.2d 783, 785 (1970))).

In evaluating foreseeability, "Oregon courts consider 'whether plaintiffs' injuries were within the type of potential harms that made defendant's conduct unreasonable and whether plaintiffs were within a reasonably foreseeable class of injured persons.'" *Brown v. Caterpillar Inc.*, No. 2:21-cv-01865-HL, 2022 WL 3219605, at *6 (D. Or. June 29, 2022) (quoting *Chapman v. Mayfield*, 361 P.3d 566, 572 (Or. 2015)). "The concept of foreseeability in negligence cases involves (1) a factual assessment of whether the thing that happened could have been predicted

PAGE 79 – OPINION AND ORDER

or anticipated, and, if so, (2) a value judgment about whether that thing could and should have been prevented by altering the conduct on which the factual prediction of harm was made." *F.T. v. W. Linn-Wilsonville Sch. Dist.*, 509 P.3d 655, 662 (Or. Ct. App. 2022) (citing *Piazza v. Kellim*, 377 P.3d 492, 521 n.6 (Or. 2016)). This analysis is "conduct[ed] through the lens of the particular factual circumstances of the case[.]" *Jennewein v. MCIMetro Access Transmission Serv.*, 481 P.3d 939, 944 (Or. Ct. App. 2021). "[T]he question is whether a reasonable person considering the potential harms that might result from his or her conduct would 'have reasonably expected the injury to occur.'" *Chapman*, 361 P.3d at 572 (quoting *Stewart*, 469 P.2d at 786).

"[T]he plaintiff in a negligence action must [also] . . . prove an actual causal link between the defendant's conduct and the plaintiff's harm—that is, the plaintiff must prove 'cause in fact.'" *Towe v. Sacagawea, Inc.*, 347 P.3d 766, 775 (Or. 2015) (quoting *Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 327 (Or. 2004)). According to the Oregon Supreme Court, "[w]hen the evidence shows two or more equally probable causes of injury, for not all of which the defendant is responsible, no action for negligence can be maintained." *Simpson v. Hillman*, 97 P.2d 527, 529 (Or. 1940). "In other words, negligence [cannot] be based on conjecture or speculation." *Id.*

"Under Oregon law, a comparative fault defense prevents a negligent plaintiff from recovering his percentage fault of damages." *Raboin v. Workday, Inc.*, No. 3:23-cv-1230-SI, 2026 WL 145948, at *8 (D. Or. Jan. 20, 2026) (citing OR. REV. STAT. § 31.600(1), (2)). In assessing comparative fault, "[t]he trier of fact shall compare the fault of the claimant with the fault of any party against whom recovery is sought" and "any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the claimant." OR. REV. STAT. § 31.600(1), (2)). A "comparative fault [] defense is 'not recognized' at common law when

PAGE 80 – OPINION AND ORDER

'the defendant's conduct [was] actually intended to inflict harm upon the plaintiff.'" *Raboin,* 2026 WL 145948, at *8 (citation omitted).

### B.    Analysis

The Court grants the County Defendants' motion for summary judgment on Plaintiffs' negligence claim and denies as moot Plaintiffs' motion for summary judgment on the County Defendants' comparative fault affirmative defense.

The County Defendants argue that Plaintiffs "have not pleaded and cannot produce evidence that Deputy Ferguson knew or reasonably should have known that pursuing an eluding suspect would foreseeably end in the suspect getting out of the car with a gun and an allegedly unlawful officer involved shooting." (Cnty. Defs.' Mot. at 58.) Defendants further claim that "[i]t is entirely unclear" how "Clark's injury might be considered within the category of injuries that might result from a negligent vehicle pursuit." (*Id.* at 59.) Plaintiffs respond that Clark's injuries were foreseeable and that "[f]or the same reason, [Clark]'s injury and death was within the general type of injuries that made [Deputy] Ferguson's pursuit negligent." (Pls.' Resp. Cnty. Defs.' Mot. Summ. J. at 25-26.) The Court concludes that Clark's death resulting from deadly force was not a reasonably foreseeable consequence of Deputy Ferguson's decision to continue pursuing Clark.

Under Oregon law, a law enforcement officer who continues to pursue an eluding vehicle under dangerous circumstances may be liable for negligence for any "foreseeable risk of harm to passengers in the fleeing car." *Dee By & Through McDonald v. Pomeroy*, 818 P.2d 523, 527 (Or. Ct. App. 1991) ("However, in the light of evidence about the nature of the traffic offense that precipitated the chase, the speed at which the car was traveling and [the officer]'s knowledge of the barricade at the end of the street, we cannot say as a matter of law that the manner in which the chase was continued could not be found to have been negligent and created a foreseeable risk

PAGE 81 – OPINION AND ORDER

of harm to passengers in the fleeing car.") (citation omitted). Similarly, "given the nature of the risk created by [a] high-speed pursuit, injury to third persons may be found to be a foreseeable result of the officer's continuation of the pursuit." *Lowrimore v. Dimmitt*, 797 P.2d 1027, 1030 (Or. 1990) (citation omitted). Here, had Deputy Ferguson's continued pursuit resulted in injuries to Clark or a third party caused by the pursuit itself, Plaintiffs may have a viable negligence claim. However, Plaintiffs have pointed to no authority for their argument that an officer-involved shooting—which caused the resulting harm here—was a reasonably foreseeable consequence of a negligent vehicle pursuit.[18]

For these reasons, the Court finds that Clark's death resulting from the officers' use of force was not within the category of injuries that foreseeably results from a negligent vehicle pursuit. As a result, even if Plaintiffs "were able to prove all the facts alleged in the complaint, [Plaintiffs] would still not have proved one element necessary to recovery, the foreseeability to defendant of an unreasonable risk of harm to persons in [the] plaintiff's position." *Fuhrer v. Gearhart-By-The-Sea*, 760 P.2d 874, 880 (Or. 1988) (en banc). Accordingly, the Court grants the County Defendants' motion for summary judgment on Plaintiffs' negligence claim. *See Sparks v. Warren*, 856 P.2d 337, 339 (Or. Ct. App. 1993) (granting summary judgment on the plaintiff's negligence claim because the "plaintiff did not present evidence sufficient to create an inference that defendant's conduct created a foreseeable risk of the kind of injury that occurred").

///

///

---

[18] Plaintiffs point to Bercovici's opinion that "adrenaline expended by officers in conducting vehicle pursuits will extend to any confrontation after the chase is ended and that impermissible use of force is likely to result." (Bercovici Decl. at 11.) While that may be true, an officer's adrenaline level does not render a target's elude by foot with a firearm and failure to obey commands foreseeable.

PAGE 82 – OPINION AND ORDER

IX.    ASSAULT AND BATTERY

Plaintiffs allege that "Defendant Ferguson struck [] Clark's vehicle with his vehicle twice, unlawfully shot at [] Clark numerous times, wounded him, [and] deputies who work for Clackamas County threw explosives at him and had a dog bite him." (TAC ¶ 165.) Plaintiffs also claim that "Clackamas County is vicariously liable" for the individual defendants' assault and battery. (*Id.* ¶ 166.) The County Defendants assert an affirmative defense that they "acted reasonably and with justification under the totality of circumstances." (Cnty. Defs.' Ans. at 11.)

The County Defendants move for summary judgment on the ground that "[j]ustification precludes" these claims and that "Oregon law permits a law enforcement officer to use a reasonable amount of force in making an arrest." (Cnty. Defs.' Mot. at 37.) Accordingly, the County Defendants argue that "to the extent this Court finds that no excessive force occurred for purposes of the Fourth Amendment, this Court should find that no common law assault and/or battery occurred." (*Id.*) Plaintiffs also move for summary judgment on the County Defendants' justification affirmative defense, arguing that this is not a defense to any of Plaintiffs' federal claims and that "[t]he only claims to which [Deputy] Ferguson may have a valid 'justification' defense are the assault/battery claims." (Pl.'s Mot. Cnty. Defs.' at 30.)

A.    Applicable Law

"Under Oregon law the question in an assault or battery claim against a police office[r] acting in the course of official duty is whether the force used in making the arrest is reasonable." *Cruz-Manjarrez v. City of Portland*, No. 04-cv-1811-AS, 2007 WL 9811151, at *11 (D. Or. Jan. 12, 2007) (citing *Gigler v. City of Klamath Falls*, 537 P.2d 121, 125 (D. Or. 1975)). "Police officers using reasonable force to legitimately fulfill their duty as police officers are not liable for battery." *Deconnick v. City of Seaside*, No. 3:12-cv-01501-HZ, 2013 WL 5939965, at *8 (D. Or. Nov. 3, 2013). "[O]nly excessive force by a police officer carrying out an arrest can give rise to

PAGE 83 – OPINION AND ORDER

civil liability for battery." *Gregory v. City of Newberg*, No. 3:15-cv-00473-BR, 2015 WL 5577755, at *7 (D. Or. Sept. 21, 2015). "A police officer has a complete defense to civil liability for assault or battery if the officer used force as authorized by statute." *Wagoner v. City of Portland*, No. 3:14-cv-2063-AC, 2017 WL 2369399, at *10 (citing *Gigler*, 537 P.2d at 125). "Accordingly, the success of a plaintiff's assault and battery claims is contingent upon whether the use of force was excessive under the Fourth Amendment." *Price v. City of Sutherlin*, 945 F. Supp. 2d 1147, 1157 (D. Or. 2013) (first citing *Ballard v. City of Albany,* 191 P.3d 679, 686 (Or. App. 2008), and then citing *Saman v. Robbins,* 173 F.3d 1150, 1157 n.6 (9th Cir. 1999)).

### B.    Analysis

As discussed above, there are genuine issues of material fact concerning the reasonableness of Deputy Ferguson's and Deputy Sanders' uses of force. Plaintiffs' battery and assault claims against Clackamas County depend on whether Deputy Ferguson's and Deputy Sanders' uses of force were reasonable. Accordingly, the Court denies the County Defendants' motion for summary judgment on Plaintiffs' assault and battery claims and Plaintiffs' motion for summary judgment on the County Defendants' justification affirmative defense. *See Deconnick*, 2013 WL 5939965, at *8 (denying motion for summary judgment on battery claim because "there [were] genuine issues of material fact as to whether the force [the officer] used on [the p]laintiff was reasonable or excessive"); *Price*, 945 F. Supp. 2d at 1157-58 (denying motion for summary judgment on assault and battery claims because "factual questions remain regarding whether [the officer's] use of force was excessive or otherwise reasonable . . . under the Fourth Amendment").

### X.    AFFIRMATIVE DEFENSES

The Court addresses Plaintiffs' motions for summary judgment on Defendants' affirmative defenses not already addressed herein.

PAGE 84 – OPINION AND ORDER

### A.  Oregon Tort Claims Act

The County Defendants allege that "Plaintiffs' state law claims are subject to all provisions of the Oregon Tort Claims Act, [OR. REV. STAT. §] 30.260 through .300, including but not limited to the damage cap provisions." (Cnty. Defs.' Ans. ¶ 28.) Plaintiffs argue that the County "Defendants have pled no facts in their answers to support their affirmative defense." (*See* Pls.' Mot. Summ. J. Cnty. Defs. at 31.) The Court denies Plaintiffs' motion for summary judgment on the OTCA affirmative defense because the motion is premature.

### B.  Failure to State a Valid Claim for Relief

Officer Mawson alleges an affirmative defense that "[o]ne or more of Plaintiffs' claims against Mawson fail to state a valid claim for relief." (Officer Mawson's Ans. at 7.) Plaintiffs move for summary judgment on the ground that Officer "Mawson has already filed a motion to dismiss Plaintiffs' claims against him, and the Court denied that motion as to the claims that remain." (Pls.' Mot. Summ. J. Officer Mawson at 13.) The Court agrees and grants Plaintiffs' motion for summary judgment on Mawson's affirmative defense.[19]

### CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motions for summary judgment against the County Defendants (ECF No. 121), Trooper Cole (ECF No. 122), and Officer Mawson (ECF No. 123), GRANTS IN PART and DENIES IN PART the County Defendants' motion for summary judgment (ECF No. 159), DENIES Officer Mawson's motion for summary judgment (ECF No. 186), and GRANTS IN PART and DENIES

---

[19] In Plaintiffs' motions for summary judgment, they also ask the Court to treat a range of factual issues as "undisputed[.]" (*See, e.g.*, Pls.' Mot. Summ. J. Cnty. Defs. at 3-4.) The Court declines to do so.

PAGE 85 – OPINION AND ORDER

IN PART Trooper Cole's motion for summary judgment (ECF No. 189). The Court DISMISSES Plaintiff D.M.M. and the Doe Defendants.

The Court also GRANTS Plaintiffs' unopposed motion to unseal Exhibits Y, Z, and AA (ECF No. 127) and directs the Clerk to unseal Attachment 1 to the Joint Declaration of Mohammad Hamoudi (ECF No. 125-1); and DENIES Plaintiffs' Motion for Imposition of Sanctions for Spoliation of Evidence Pursuant to Rule 37(e) (ECF No. 140) with leave to propose an adverse inference jury instruction in Plaintiffs' proposed jury instructions pursuant to the Court's Civil Trial Management Order and with leave for Deputy Ferguson to oppose the proposed jury instruction.

The following claims will proceed to a jury trial beginning on October 14, 2026: (1) excessive force claims against Deputy Ferguson, Trooper Cole, and Deputy Sanders; (2) failure to render aid claims against the County Defendants and Officer Mawson; (3) familial due process claims against the County Defendants and Officer Mawson; (4) Section 1983 excessive force conspiracy claim against Deputy Sanders, Officer Robinson, Officer Reynolds, and Officer Mawson; and (5) assault and battery claims against Clackamas County.

**IT IS SO ORDERED.**

DATED this 31st day of March, 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 86 – OPINION AND ORDER

**NOTICE OF FILING AND PROOF OF SERVICE**

I certify that on April 29, 2026, I directed the original Notice of Appeal to be

electronically filed with the Clerk of the Court for the United States District Court for the District

of Oregon by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will

be accomplished by the appellate CM/ECF system.

I further certify that on April 29, 2026, a copy of the Notice of Appeal was sent via

certified mail, return received requested, in an envelope with postage pre-paid to the following:

Joseph Andrew Grube
Grube Orehoski, PLLC
1200 5th Ave., Ste. 1711
Seattle, WA  98101

Darcy Covert, Edward Moore,
Karen K. Koehler, Mohammad Ali Hamoudi
Stritmatter Law
3600 15th Ave. W., Ste. 300
Seattle, WA  98119

Scott C. Ciecko
Clackamas County Counsel
Public Services Bldg.
2051 Kaen Road
Oregon City, OR  97045

Andrew D. Campbell
Elayna Z. Matthews
Heltzel Williams, PC
P.O. Box 1048
Salem, OR  97308

/s/  Robert A. Koch
—————————————————————
ROBERT A. KOCH  #072004
Attorney-in-Charge
Civil & Administrative Appeals
robert.a.koch@doj.oregon.gov

Attorney for Defendant-Appellant
Zachary Cole

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 378-4402 / Fax: (503) 378-6306